Sanford-Day Iron Works, Appellant, *v.* Fancy
Hill Coal Company.

Argued October 11, 1935.   Before FRAZER, C. J., KEP-
HART, SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*Forrest Andrews,* with him *Carr & Carr,* for appellant.

*Jos. W. Ray, Jr.,* of *Shelby, Hackney & Ray* and *James G. Marks,* for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, March 23, 1936:

Appellant, plaintiff in the court below, a manufacturer of mine cars, replevied 125 cars which it had delivered to appellee pursuant to a contract entitled "Lease Agreement" dated June 15, 1928. Appellee filed a counterbond, retained the cars and interposed a statutory demurrer to the statement of claim in replevin. Judgment was entered for the appellee and this appeal was taken.

The demurrer raised the only real dispute between these parties which relates to the construction of this "Lease Agreement" and the application and purpose of certain payments made by appellee under it. The contract provides for the leasing of 125 mine cars to the appellee for which payment of the sum of $35.62 for "use, upkeep, etc.," is to be made every six months. After five such payments are made, the lease states: "The sixth and each successive lease payment shall be only $17.81 for each leased car." Provision was also made for an option in the appellee to purchase the cars, valued each at $213.72. After the first semiannual payment of $35.62 appellee was given the option of purchasing each car for $185.22. Thereafter, as payments of $33.62 were made every six months, the purchase price was successively reduced to $155.58, $124.76 and $92.70. When five lease payments had been made, or at the time when the semiannual payments were reduced to $17.81, the cash buying price of the cars was fixed at $59.36. Beyond this

there is no reduction in the purchase price. Appellee paid five semiannual payments of $35.62 and three semiannual payments of $17.81. It then refused to make any further payments claiming that by payment of these amounts it had purchased the cars. When suit was instituted, the sum of $1,206.12 was paid by the appellee to appellant "without prejudice."

The lower court stated that "while this agreement proposes to be a lease contract, when it is considered as a whole it is apparent that the purpose was to effect a sale of the mine cars," and concluded that the semiannual payments were partial applications on the purchase price and that, so applied, the appellee had paid the full value of the mine cars.

To determine the meaning of this contract and thus the intent of the parties, resort must be had to its express terms and the ordinary meaning which attaches to them: *Schmidt v. Bader,* 284 Pa. 41; *Brown Bros. & Co. v. Billington,* 163 Pa. 76. The premise that a particular contract works a hardship cannot be used to arrive at what would be "a better bargain" for one or the other of the parties, or a more desirable interpretation. Only where the terms of the contract are ambiguous are we permitted, by construction, to avoid an unconscionable result. It is appellant's contention that after the fifth lease payment was made appellee had a choice between two courses of conduct. It could pay $17.81 each six months and remain the lessee of the mine cars, or, if it chose, it could pay the sum of $59.36 and become their absolute owner. This is the meaning clearly expressed in this contract and the only one deducible from it. Here appellee chose to remain the lessee. As such it was bound by the terms of the contract to continue to make payments of $17.81 every six months as rental.

We are not convinced that the purpose of this agreement was to effect a sale of the mine cars. Neither the plan nor the purpose of the agreement as expressed therein, nor the mathematics of its operation show that

that was its only purpose. It provided for sale, but passage of title was dependent upon payment of the sum set forth as purchase price and not of the sums denominated lease payments. That there was a coincidence between reduction of the purchase price as the first five rental payments were made does not necessarily mean that every such lease payment was to be so applied unless it was so stated in the contract. That such application is to be made does not appear in the contract, and, moreover, the reductions in purchase price are as easily accounted for by the depreciation of these cars due to wear, tear and age as they might be by a planned purpose to achieve purchase of these cars by the appellee. According to the construction given to this agreement by the court below, it would necessarily terminate at the end of four years and yet, the contract itself provides for contingencies six and eight years after the date of its formation. By clause 8, the appellee was given the right to cancel the lease at any time after the cars had been in its possession six years by conforming with certain conditions. A similar right of cancellation was given after the cars had been in its possession under the lease eight years by complying with certain other conditions. Manifestly these provisions would be meaningless if, at the termination of regular semiannual payments over a period of four years, title was to vest absolutely in the appellee. Moreover, throughout the agreement it refers to "lease," "lessor" and "lease payments," and thus clearly indicates that its primary purpose was to rent these cars.

It is unquestionably true that the purchase price of these cars was reduced as the first five lease payments were made. It does not follow, however, that if the appellee refused to pay what was then stipulated to be a cash purchase price of $59.36 and chose instead to pay semiannual rentals of $17.81 that these rental payments necessarily must be in reduction and retirement of the $59.36. The lease is explicit in stating that "the sixth and each successive lease payment" shall be only $17.81.

That this entire amount is applied for rental and no part in reduction of the purchase price is of no moment. As appellant states, the depreciation on these cars occurs earliest in their life and at the same time the amounts necessary for repair are then smallest. The appellant was obligated to repair, and since repairs to this class of property are very high, after use for four or five years, it follows that it was merely safeguarding itself in applying the entire amount of the sixth and successive lease payments to rental, upkeep and use.

The error into which the court below fell is clearly shown by the fact that even if the full sixth, seventh and eighth lease payments are applied to the purchase price of $59.36, they do not equal this price even without deduction from the payments of unascertained sums for interest and use. Appellee evidently realized this difficulty and it was for this purpose that it paid the further sum of $1,206.07. This payment was not required by the terms of the lease. The fact that a makeshift arrangement, not deducible from the terms of the contract, had to be adopted to give to this contract the meaning placed upon it by the lower court and to carry out the arrangement which it considered the contract to contain, shows clearly that the contract itself was not formulated with this purpose in view and that in its operation was not intended to effect a passage of title through the mere application of the lease payments.

The judgment of the court below is reversed and it is ordered that the record be returned with direction to the court below to enter judgment for the appellant for the amount found due by the pleadings unless other and further cause be shown to the contrary. Costs to be paid by appellee.