

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-1995

# Valhal Corp v Sullivan Assoc

Precedential or Non-Precedential:

Docket 91-3650

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Valhal Corp v Sullivan Assoc" (1995). *1995 Decisions.* Paper 1.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/1

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-1221
No. 94-1241


VALHAL CORP.,

Cross-appellant

v.

SULLIVAN ASSOCIATES, INC.,
ARCHITECTS, PLANNERS, ENGINEERS,

Appellant


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


(Civil No. 91-CV-3650)


Argued September 26, 1994
Before: SCIRICA, NYGAARD and McKEE, Circuit Judges

(Opinion filed: January 3, 1995)


OPINION OF THE COURT


Kean K. McDonald, Esq.
Pamela Tobin, Esq. (ARGUED)
Lisa C. Fogel, Esq.
LABRUM & DOAK
1818 Market Street
Suite 2900
Philadelphia, PA  19103

Attorneys for Appellant

Ira B. Silverstein, Esq. (ARGUED)
Gerald E. Arth, Esq.
FOX, ROTHSCHILD, O'BRIEN & FRANKEL
2000 Market Street, 10th floor
Philadelphia, PA  19103

Attorneys for Cross-appellant

William J. Kennedy, Esq.
Robert C. Clothier, Esq.
DECHERT, PRICE & RHOADS
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103

Attorneys for Amici Curiae:

American Consulting Engineers Council,
Hazardous Waste Action Coalition,
Consulting Engineers Council of
Pennsylvania, and
AFSE: The Association of Engineering
Firms Practicing in the Geosciences.

C. Grangier Bowman, Esq.
Gunther O. Carrle, Esq.
POWELL, TRACHTMAN, LOGAN, CARRLE
& BOWMAN, P.C.
367 South Gulph Road
King of Prussia, PA  19406

Attorneys for Amici Curiae:

American Institute of Architects,
National,
Pennsylvania Society of Architects and
its Regional Chapters – AIA,
Bucks County, AIA Central PA,
Eastern PA, AIA, Middle, PA, AIA,
Northeastern PA, AIA,
Northwestern PA, AIA,
AIA Philadelphia and AIA Pittsburgh,
Coalition of American Structural
     Engineers,
Delaware    Valley    Association    of
Structural
     Engineers,

National Society of Professional
Engineers,
Pennsylvania Society of Professional
Engineers,
National Council of Structural Engineers
Associations

McKEE, Circuit Judge

This dispute centers on the enforceability of a limitation of liability clause in a contract between a real estate developer (Valhal Corporation), and an architectural firm (Sullivan Associates). Valhal and Sullivan have both filed appeals from the order of the district court denying Sullivan's motion for partial summary judgment and granting Valhal's motion for partial summary judgment. The district concluded that the disputed clause was part of the contract but that it violated public policy and was therefore unenforceable. We will reverse, and dismiss for lack of jurisdiction.

## I. Factual and Procedural Background

Valhal is a New York corporation which specializes in the management and development of real estate. Sullivan Associates, Inc., is a Pennsylvania corporation specializing in architectural, planning and engineering services. In March of 1989, Valhal became interested in buying a parcel of real estate located at 401 N. 21st Street in Philadelphia, Pennsylvania, known as the "Channel 57 Property". Valhal planned to build a high-rise residential tower on a portion of that property. In early June of 1989, Valhal and Sullivan discussed the possibility

of Sullivan performing certain work in connection with the project, including a feasibility study.

As a result of those discussions, Sullivan forwarded a proposal to Valhal, dated June 7, 1989, detailing the services which Sullivan would perform. A document entitled "Standard Consulting Contract Terms and Conditions" was attached to the proposal and provided in part:

> Enclosed you will find our Standard Consulting Contract Terms and Conditions which are hereby made a part of this proposal, as well as a copy of our Hourly Billing Rates for your knowledge. We believe the above scope of services incorporates the elements discussed. If you are in agreement with the terms of this proposal, we ask that you sign both copies and return one copy for our records. At that time, a retainer in the amount of $1,000 is to be provided to Sullivan Associates, Inc.

Paragraph 9 of the attached Standard Consulting Contract Terms and Conditions is at the heart of the current controversy.

Paragraph 9 provided:

> The OWNER agrees to limit the Design Professional's liability to the OWNER and to all construction Contractors and Subcontractors on the project, due to the Design Professional's professional negligent acts, errors or omissions, such that the total aggregate liability of each Design Professional shall not exceed $50,000 or the Design Professional's total fee for services rendered on this project.
> Should the OWNER find the above terms unacceptable, an equitable surcharge to absorb the Architect's increase in insurance premiums will be negotiated.

The Standard Consulting Contract Terms and Conditions was signed by Andrew Sullivan as president of the company.

Sullivan's initial proposal provided that its services would be performed in two phases -- Phase "A" and Phase "B" -- and that Sullivan's total fee would be $5,000.  Valhal responded by requesting that a service to be performed under Phase "B" be included under Phase "A" and by requesting that two completely new services be added to Phase "A". Sullivan agreed and a new proposal was submitted to Valhal on June 22, 1989 in which Sullivan increased its fee from $5,000 to $7,000 because of the additional work it was to perform under Phase A.  This second proposal once again incorporated the Standard Contract Terms and Conditions, including the limitation of liability provision, and was again signed by Andrew Sullivan.   After reviewing the second proposal, Valhal requested another change to which Sullivan agreed. Sullivan then submitted a third proposal on July 24, 1989, which also incorporated the Standard Contract Terms and Conditions, including the limitation of liability provision which remained unchanged and which was signed by Andrew Sullivan. Although Valhal never signed the proposal letter or the Standard Contract Terms and Conditions,   Valhal did fax a letter to Sullivan dated August 4, 1989 signed by Valhal's Vice-President.

That letter stated:
> As per your conversation with my assistant
> this morning, we would like you to begin your
> study of the Channel 57 property as soon as
> possible. This letter will serve as
> authorization for you to initiate a
> feasibility study highlighting the
> possibility of the construction of a tower

[on the property]. We would like your study
to include engineering research, as well as
estimation of construction costs, with
similar structures such as Corman (sic)
suites sited (sic) for comparison.

Sullivan responded by performing the services outlined in the July 24, 1989 proposal, and thereafter provided a written report to Valhal in which Sullivan concluded that the Channel 57 property was not burdened with any height restrictions and that it was possible to erect the tower on the property without any special governmental approvals.

Valhal thereafter entered into an Agreement of Sale for the purchase of the Channel 57 property. However, after the sale contingencies expired, Valhal learned that the property was subject to a height restriction which would be violated by its building. Nevertheless, Valhal proceeded to closing and paid the purchase price of $10.1 million.[1] Valhal then brought a diversity action against Sullivan pursuant to 28 U.S.C. §1332 seeking damages in excess of $2,000,000 for breach of contract, negligence, gross negligence and negligent misrepresentation based upon Sullivan's failure to inform it of the height restriction.

Sullivan thereafter moved for partial summary judgment on the grounds that its liability was expressly limited to $50,000 and that the district court therefore lacked diversity jurisdiction. Valhal moved to strike the limitation of liability

_____

[1]Valhal asserts that it proceeded to sale in order to mitigate its damages.

provision arguing that it was not a part of the contract and that even if it was, it was unenforceable. Valhal also argued that the limitation of liability clause, if enforceable, was limited only to its claim for negligence and did not apply to its breach of contract claim or to its gross negligence claim. The district court treated the parties' motions as cross-motions for summary judgment, denied Sullivan's motion, and granted Valhal's motion. The court ruled that the provision was part of the contract, but that it was against public policy as expressed in 68 Pa. Cons. Stat. Ann. § 491 (Purdons 1994) (the anti-indemnity statute) and therefore unenforceable. See Memorandum and Order, dated May 17, 1993.[2] Valhal Corp. v. Sullivan Associates, Inc., 1993 WL 175285 (E.D. Pa. 1993).

Thereafter, the jury returned a verdict in favor of Valhal on both the contract and negligence claims but awarded damages of $1,000,000 on the contract claim only. The jury also concluded that Sullivan was not liable for gross negligence or negligent misrepresentation. Sullivan's post-verdict motions were denied, and this appeal followed.

## II. Discussion

Both Sullivan and Valhal now renew the arguments they made to the district court. We will consider the parties' claims seriatim.

---

[2] The district court did not find the limitation of liability provision violated the Pennsylvania anti-indemnity statute. It did hold, however, that the provision violated the public policy evidenced by that statute.

The standard of review applicable to a grant of summary judgment is plenary. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1297 (3d Cir. 1993). "On review, the appellate court is required to apply the same test the district court should have utilized initially." Goodman v. Mead Johnson & Co., 535 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977). A motion for summary judgment shall be granted if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining if there is a genuine issue of material fact, "[i]nferences . . . drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Goodman, 534 F.2d at 573.

## A. The Limitation of Liability Clause is Part of the Contract

Although Valhal admits that it contracted with Sullivan, it relies primarily upon L.B. Foster Co. v. Tri-W Constr. Co., Inc., 186 A.2d 18 (Pa. 1962), to argue that the provision limiting Sullivan's liability to $50,000 was not part of the contract. Valhal asserts that under L.B. Foster Co. such a provision cannot be enforced under Pennsylvania law without some specific manifestation of the consent of the party purportedly bound.

Valhal further argues that since it neither signed the contract as requested in Sullivan's proposals, nor manifested conscious consent to the limitation of liability, that clause never became part of the contract.  In L.B. Foster Co., the Pennsylvania Supreme Court held that a warrant of attorney to confess judgment printed on the reverse side of a contract was not binding because it was not signed by the alleged promisor.  However, that holding does not assist our analysis.  A warrant of attorney to confess judgment has a "very special and significant status" which "confers. . . plenary power on the donee in respect of the adjudication of his[/her] own claims. . . ." Frantz Tractor Co., Inc., v. Wyoming Valley Nursery, 120 A.2d 303, 305 (Pa. 1956).

> A warrant of attorney authorizing judgment is perhaps the most powerful and drastic document known to civil law.  The signer deprives himself[/herself] of every defense and every delay of execution, he[/she] waives exemption of personal property from levy and sale under the exemption laws, he[/she] places his[/her] cause in the hands of a hostile defender.  The signing of a warrant of attorney is equivalent to a warrior of old entering a combat by discarding his shield and breaking his sword.  For that reason the law jealously insists on proof that his[/her] helplessness and impoverishment was voluntarily accepted and consciously assumed.

Cutler Corp. v. Latshaw, 97 A.2d 234, 236 (Pa. 1953).  It was the draconian nature of a warrant of attorney to confess judgment which caused the court in L. B. Foster Co. to rule that

> a warrant of attorney to confess judgment must be self-sustaining and to be self-sustaining the warrant must be in writing and signed by the person to be bound by it.  The requisite signature must bear a direct

> relation to the warrant of attorney and may
> not be implied.

L. B. Foster Company, 186 A.2d at 20.

However, Pennsylvania courts have never generalized this rule to other types of contractual provisions.[3]  In Westinghouse Elec. Co. v. Murphy, Inc., 228 A.2d 656, 660-661 (Pa. 1967), the Pennsylvania Supreme Court specifically declined to hold that an indemnity provision in an unsigned contract could not be enforced against the indemnitor-painting contractor.  There, the surrounding circumstances provided the necessary manifestation of consent to the terms of the contract including the indemnity provision even though the latter was only attached as an appendix.

Similarly, Pennsylvania law does not condition enforcement of a limitation of liability provision upon any specific form of consent, and an unsigned contract can include an enforceable agreement to limit liability if both parties manifest their approval of the terms.  This is true whether the clause at issue is an exculpatory clause, an indemnification clause or a limitation of liability clause. Westinghouse Elec. Co. v. Murphy,

---

[3]A caveat is in order, however.  Certain contracts must be in writing in order to satisfy the Statute of Frauds. 33 P.S. §1 et seq. In addition, there are instances where diminutive type grossly disproportionate to that used in the remainder of a baggage claim check has been held to be ineffective to limit a common carrier's liability to a passenger for lost baggage without proof of the positive assent of the passenger.  This is the "subterfuge of fine print" first referred to in Verner v. Sweitzer, 321 Pa. 208 (1858).  Of course, neither instance is applicable here.

Inc.; <u>Daniel Adams Assoc. Inc. v. Rimbach Publishing Co.</u>, 519

A.2d 997, 1004 (Pa. Super. 1987).[4]

> [w]hen the parties have not only completed their arrangements but have actually completed the commercial relationship involved, notwithstanding the absence of definite written terms, a trier of fact is entitled to view the entire dealing and conclude that it indicated there was a contract with terms mutually understood between the parties.

<u>Caisson Corp. v. Ingersoll-Rand Co.</u>, 622 F.2d 672, 678 (3d Cir. 1980).

When the course of dealings between Valhal and Sullivan is viewed in the light most favorable to Sullivan,[5] it is clear that Valhal consented to the Standard Consulting Contract Terms and Conditions (including the limitation of liability clause) that were attached to each proposal. Valhal authorized Sullivan to proceed after reviewing each proposal containing those terms. In addition, Sullivan expressly invited Valhal to negotiate for a higher limit if Valhal found the conditions unacceptable. Valhal's only response was to fax a letter to Sullivan authorizing it to proceed. Therefore, the district court did not err in ruling that the limitation of liability clause was part of the contract between Valhal and Sullivan.

Valhal argues that the changes negotiated after the first proposal constituted a counter-offer that somehow caused the

---

[4]See discussion of the differences in these three types of clauses <u>infra</u>.

[5]<u>Goodman</u>, 534 F.2d at 573.

limitation of liability clause to disappear from the contract. However, those changes only addressed the services to be performed during various phases of the undertaking and did not constitute "a substituted bargain differing from that proposed by the original offer." Restatement (Second) of Contracts, §39(1).

Moreover, even if the changes requested by Valhal had constituted a counter-offer, the limitation of liability clause was nevertheless a part of any subsequent agreement as it was a part of each proposal which Sullivan tendered. The district court thus properly concluded that Valhal's August 4, 1989 letter authorizing Sullivan to proceed constituted an acceptance of the limitation of liability contained in the standard consulting contract.

### B. The Limitation of Liability Clause is Enforceable.

The heart of the instant controversy is Valhal's contention that the limitation of liability clause is unenforceable even if it is part of the contract with Sullivan. Valhal argues that limitation of liability provisions are disfavored in Pennsylvania and that this particular clause violates a specific public policy against an architect limiting his/her liability for damages caused by his/her own negligence.

### 1. Pennsylvania Does Not Have a General Policy Against Such Clauses.

The law recognizes different methods by which a party can limit his/her exposure to damages resulting from his/her negligent performance of a contractual obligation. An exculpatory clause immunizes a person from the consequences of

his/her negligence. See, e.g., Topp Copy Products, Inc. v. Singletary, 626 A.2d 98, 99 (Pa. 1993). Similarly, an indemnity clause holds the indemnitee harmless from liability by requiring the indemnitor to bear the cost of any damages for which the indemnitee is held liable.[6] See, e.g., Potts v. Dow Chemical Co., 415 A.2d 1220, 1221 (Pa. Super. 1980). The instant clause has no such consequence. The clause before us does not bar any cause of action, nor does it require someone other than Sullivan to ultimately pay for any loss caused by Sullivan's negligence. Sullivan remains liable for its own negligence and continues to be exposed to liability up to a $50,000 ceiling. Thus, the amount of liability is capped, but Sullivan still bears substantial responsibility for its actions. Hart v. Pennsylvania R.R. Co., 112 U.S. 331, 5 S.Ct. 151, 154-156 (1884).

Valhal asserts that exculpatory clauses, indemnity clauses and limitation of liability clauses differ only in form as the effect of each is to limit one's liability for one's own negligence. Brief of Valhal Corp. at 24-25. Valhal contends that, thus, limitation of liability clauses are disfavored in Pennsylvania and must meet stringent standards to be enforceable.

There are similarities between these types of clauses. Dilks v. Flohr Chevrolet, Inc., 192 A.2d 682, 687 n.11 (Pa.

---

[6]Generally, an indemnity agreement also includes a "hold harmless" clause by which the indemnitor agrees "to indemnify and hold harmless" the indemnitee. A hold harmless agreement is "A contractual arrangement whereby one party assumes the liability inherent in the undertaking, thereby relieving the other party of the responsibility." Black's Law Dictionary 658 (5th ed. 1979).

1963).  Indeed, the test used to determine the enforceability of exculpatory and indemnity provisions is the same. *Id.*  Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence.  The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement.  Topp Copy Products, 626 A.2d at 99. The district applied this test to the limitation of liability clause at issue here. See Memorandum Opinion, 1993 WL 175285 at *3.

Courts have developed these limitations as reasonable conditions precedent to allowing a party to contract away responsibility for his/her negligence. It is with good reason therefore, that Pennsylvania allows such contractual provisions only where matters of public interest are not involved. One can not contract away responsibility to the public to exercise reasonable care in performing a contract. Topp Copy Products, at 99.

However, Pennsylvania appellate courts recognize that there are differences between a contract which insulates a party from liability and one which merely places a limit upon that liability. DeFrancesco v. Western Pa. Water Co., 478 A.2d 1295, 1306 (Pa. Super. 1984). The difference between the two clauses "is. . . a real one." Posttape Assocs. v. Eastman Kodak Co., 537 F.2d 751, 755 (3d Cir. 1976). Presumably because of that difference, we find no Pennsylvania cases in which a limitation of liability clause has been disfavored or been tested by the same stringent standards developed for exculpatory, hold harmless, and indemnity clauses. Accordingly, we believe that the district court erred in applying those stringent standards to the clause before us. 1993 WL 175285 at *3.

Limitation of liability clauses are routinely enforced under the Uniform Commercial Code when contained in sales contracts negotiated between sophisticated parties and when no personal injury or property damage is involved. This is true whether the damages are pled in contract or tort. See, e.g., New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 564 A.2d 919, 924 (Pa. Super. 1989) ("[U]nder Pennsylvania law, contractual provisions. . . excluding liability for special, indirect and consequential damages are generally valid and enforceable."); 13 Pa. Cons. Stat. Ann. § 2719(c) (Purdons 1984) ("Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss in commercial is not," and such limitation is enforceble). Such provisions have routinely been upheld in

sales contracts of varying types.  See, e.g., LoBianco v. Property Protection, Inc., 598 A.2d 52, 54 (Pa. Super. 1985) (clause limiting liability of security alarm company upheld against owner whose home was burglarized); Wedner v. Fidelity Sec. Systems, 307 A.2d 429, 432 (Pa. Super. 1973) (alarm system installer's limitation of liability enforced against business operator); Eimco Corp. v. Joseph Lombardi & Sons, 162 A.2d 263, 266 (Pa. Super. 1960) (manufacturer's limitation of liability enforced against buyer-contractor); Magar v. Lifetime, 144 A.2d 747, 748 (Pa. Super. 1958) (alarm installer's limitation of liability enforced against private homeowner); see also Posttape, 537 F.2d at 755 (film manufacturer's limitation of liability enforced against producer); Keystone Aeronautics Corp. v. R. J. Enstrom Corp., 499 F.2d 146, 149 (3d Cir. 1974) (Manufacturer's limitation of liability upheld against buyer of used helicopters. "[F]reedom of contract should be permitted to allow a corporate purchaser to exercise its business judgment to forego claims for liability against the seller in exchange for a lower price."); Shafer v. Reo Motors, Inc., 205 F.2d 685, 687-688 (3d Cir. 1953) (manufacturer's limitation of warranty enforced against buyer).

This tradition is codified at 13 Pa. Cons. Stat. Ann. § 2719(c) (Purdons 1984) which provides hat such provisions are generally enforceable.  Moreover, limitation of liability clauses have been upheld in contracts not governed by the Uniform Commercial Code.  For example, in Behrend v. Bell Tel. Co., 242 Pa. Super. 47, 72, n.16 (Pa. Super. 1976), (Behrend I), vacated on other grounds, 374 A.2d 536 (Pa. 1977), rev'd and remanded in

accordance with prior opinion, 390 A.2d 233 (Pa. 1978), a business subscriber sued a telephone company for lost profits because the telephone company omitted the subscriber's paid Yellow Pages advertisement. The advertising contract contained a provision limiting the telephone company's liability for an advertising omission to the monthly charge for each month omitted. The court stated that the issue was one of first impression, but concluded "[w]e elect to join the majority of jurisdictions in upholding tariff limitations." The court then cautioned: "[h]owever, the limitation in the tariff is not enforceable if the damage is caused by willful or wanton conduct by Bell. The weight of authority supports interpreting the tariff limitations to extend only to acts of ordinary negligence and exclude conduct found to be willful, malicious or reckless." Behrend, 363 A.2d at 1166. The court then ordered that the matter be remanded to determine if the omission was willful or malicious. "If appellant Bell's acts are found . . . not to be willful or malicious, . . . damages must be limited to a maximum of the amount specified in the [limitation] in the applicable tariff provision." Id. at 1167.

Pennsylvania courts have routinely enforced such limitation of damage provisions noting they are "[t]he subject of a private contract between the customer and the telephone company. . . ." Thus, the parties "[a]re at liberty to fashion the terms of their bargain." Vasilis v. Bell of Pa., 598 A.2d 52, 54 (Pa. Super. 1991); see also Bash v. Bell Tel. Co. of Pa., 601 A.2d 825, 830 (Pa. Super. 1992).

We are persuaded that limitation of liability clauses are not disfavored under Pennsylvania law; especially when contained in contracts between informed business entities dealing at arm's length, and there has been no injury to person or property. Furthermore, such clauses are not subjected to the same stringent standards applied to exculpatory and indemnity clauses. Limitation of liability clauses are a way of allocating "unknown or undeterminable risks," K & C, Inc. v. Westinghouse Elec. Corp., 263 A.2d 390, 393 (Pa. 1970), and are a fact of every-day business and commercial life. So long as the limitation which is established is reasonable and not so drastic as to remove the incentive to perform with due care, Pennsylvania courts uphold the limitation.

> Though it is possible that an agreement setting damages at a nominal level may have the practical effect of avoiding almost all culpability for wrongful action, the difference between the two concepts is nevertheless a real one. The distinction becomes more apparent in a situation which [*sic*] the damage level set is substantial rather than minimal, . . .
> The line of demarcation between the two types of agreements has significance here because of the findings needed to establish their existence. Pennsylvania permits parties to contractually relieve themselves from the consequences of negligent acts, but any agreement must spell out the intention of the parties with particularity.

Posttape, 537 F.2d at 755. Here, Sullivan is exposed to liability which is seven times the amount of the remuneration under its contract with Valhal. Accordingly, the cap does not immunize

Sullivan from the consequences for its own actions. It is a reasonable allocation of risk between two sophisticated parties and does not run afoul of the policy disfavoring clauses which effectively immunize parties from liability.

Although it could be argued that the $50,000 limitation is nominal when compared to the final verdict, we do not believe that to be the proper measure. The inquiry must be whether the cap is so minimal compared to Sullivan's expected compensation as to negate or drastically minimize Sullivan's concern for the consequences of a breach of its contractual obligations. One can not seriously argue that a cap which leaves Sullivan exposed to damages that are seven times its expected fee insulates Sullivan from liability.

## 2. The Disputed Clause is not Contrary to the Policy Evidenced in 68 Pa. Cons. Stat. Ann. § 491.

In a related argument, Valhal contends that, even if the clause is not contrary to general public policy, it is contrary to the specific public policy prohibiting architects from entering into "hold harmless clauses." The district court agreed that such a policy is expressed in 68 Pa. Cons. Stat. Ann. § 491 (Purdons 1994) which provides in part as follows:

> Every covenant, agreement or understanding . . . in connection with any contract or agreement made and entered into by owners, contractors, subcontractors or suppliers whereby an architect . . . or his[/her] agents . . . shall be <u>indemnified or held harmless</u> for damages. . . arising out of: (1) the preparation or approval by an architect . . . or his [/her] agents. . . of . . . opinions, reports, . . . or specifications,

> or (2) the giving or the failure to give
> directions or instructions by the architect .
> . . Or his[/her] agents. . . Shall be void as
> against public policy and wholly
> unenforceable. (emphasis added).

The district court reasoned that the contract between Valhal and Sullivan violated this policy and declared the contract void. The court ruled:

> It suffices to say that the Pennsylvania
> legislature has determined as a matter of
> public policy that indemnity and hold
> harmless clauses found in certain contracts
> involving architects are unenforceable and
> void.  Thus, whether or not the statute is
> directly applicable, it certainly establishes
> that a contract for professional
> architectural services is a matter of
> interest to the public, and that an
> exculpatory provision therein contravenes
> public policy. Accordingly, we find that
> under the common law of Pennsylvania that the
> limitation on liability clause found in
> Paragraph 9 is unenforceable.

1993 WL 175285 at *3 (footnotes omitted).  In a footnote, the district court noted that section 491 may not be directly applicable as Valhal was not an "owner" at the time the contract was entered in to, and because "it is not clear from the literal language used by the Legislature whether it intended the term 'indemnified or held harmless' to include a partial limitation or cap on damages." *Id.* at *3 n.2.

Similarly, Valhal does not argue that the limitation of liability provision in its contract falls within the statute. It does contend, however, that the district court correctly concluded that the statute expresses a public policy against

architects attempting to contractually limit their liability.  We disagree.

As the district court correctly noted, the terms of the statute pertain only to indemnity and hold harmless provisions. We have already discussed the very real difference between such clauses and the one in the contract before us. Those differences preclude an assumption that a statute expressing a prohibition against indemnity and hold harmless provisions announces a public policy against something as distinct and accepted as limitation of liability clauses. Indeed, the contrary precedent which we have discussed above convinces us that such an assumption has the practical effect of amending this statute.

However, even if we assume that the public policy expressed by the statute extends to limitation of liability clauses, the statute still would not apply here. The district court quite correctly noted that the contract between Valhal and Sullivan is not between an architect and an "owner," but between an architect and a "developer".  "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. Cons. Stat. Ann. § 1921(b) (Purdons 1994).  Had the legislature intended this provision to apply to contracts between architects and developers, it clearly could have said so.  We can not interpret the statute to apply to developers (or to limitation of liability clauses) unless we stretch its language or implication beyond the boundaries of the actual statute.  See Strunack v. Ecker, 424 A.2d 1355, 1357 (Pa. Super. 1981) (where certain

things are specifically designated in a statute all omissions should be understood as exclusions).  We decline Valhal's subliminal invitation to judicially amend this statute.

We are also unpersuaded by Valhal's argument that public policy precludes licensed professionals from limiting their liability for their own negligence.  In support of this argument Valhal relies on a line of non-Pennsylvania cases which have held that public policy prohibits physicians and attorneys from contractually exculpating themselves from all liability for malpractice.   Brief of Valhal, at 31-36.

We have already noted that the contract before us does not relieve Sullivan of all liability for malpractice. In addition, this contract does not involve an agreement between a professional and an unsuspecting consumer. Nor does it involve an agreement between a client and attorney, or a patient and physician. Such contracts involve fiduciary relationships that are given special protection even to the extent of affording certain communications between such parties a testimonial privilege.[7]

---

[7] See, 42 Pa. Cons. Stat. Ann. § 5916 (Supp. 1994) ("In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him[/her] by his[/her] client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client"); 42 Pa. Cons. Stat. Ann. § 5928 (Supp. 1994) ("In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him[/her] by his[/her] client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon trial by the client."); 42 Pa. Cons. Stat. Ann. § 5929 (Supp. 1994) ("No physician shall be allowed, in any civil matter, to disclose any information which he[/she] acquired in

Here, an architectural firm and real estate developer have attempted to allocate risks between themselves in such a way that neither is relieved from liability for its own negligence. We see no reason to hold that the policy enunciated in section 491 precludes them from doing so. Valhal's argument to the contrary would more properly be addressed to the Pennsylvania legislature.

Nor can we conclude that the enactment of section 491 elevates a private contract involving an architect to a matter of public concern. In order for a contractual provision to violate public policy the provision must involve a matter of interest to the public or the state. <u>Seaton v. East Windsor Speedway, Inc.</u>, 582 A.2d 1380, 1382 (Pa. Super. 1990). In <u>Seaton</u>, a member of a speedway pit crew at a speedway was killed when a car crashed into a guardrail during a race. The decedent's estate sued the speedway alleging negligence, and the speedway moved for summary judgment based upon the release which the worker had signed which provided that the worker "releases, waives, discharges and covenants not to sue the [defendant]" in return for the worker being allowed to enter certain restricted areas. The Superior Court upheld the trial court's grant of summary judgment against an argument that the release violated public policy. The court noted:

> Appellant's argument that the Release
> violates public policy is without merit.

(..continued)
attending the patient in a professional capacity, and which was necessary to enable him[/her] to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.")

> Contracts against liability, although not
> favored by courts, violate public policy only
> when they involve a matter of interest to the
> public or the state. Such matters of interest
> to the public or state include the employer-
> employee relationship, public service, public
> utilities, common carriers, and hospitals.

*Id.* at 1382.  In addition, the Pennsylvania Superior Court has

stated that the Restatement (Second) of Contracts §195(2)(b)

(1981) "is a correct statement of the public policy of the

Commonwealth."  See DeFrancesco v. Western Pa. Water Co., 478

A.2d at 1306.[8]  Section 195(2)(b) of the Restatement provides:
> (2) A term exempting a party from tort
> liability[9] for harm caused negligently is
> unenforceable on grounds of public policy
> if...
> (b) the term exempts one charged with a duty of
> public service from liability to one to whom
> that duty is owed for compensation for breach
> of that duty.

In DeFrancesco, property owners sued a water company

alleging that its failure to provide adequate water pressure

prevented a fire from being brought under control before it

spread to their property. The water company moved for summary

judgment on the grounds that the tariff which it had filed with

the Public Utility Commission excluded such liability. The

_____

[8] While the Pennsylvania Supreme Court has not had the occasion
to adopt this section of the Restatement as expressing the public
policy of the Commonwealth, we may consider pronouncements of
state intermediate appellate courts as an indication of how the
state's highest court would rule. Adams v. Cuyler, 592 F.2d 720,
725 n. 5 (3d Cir. 1979), aff'd, 449 U.S. 433 (1981).

[9] Although the Restatement speaks in terms of "tort liability"
and the instant controversy involves contract liability, we do
not believe the distinction alters our analysis here. See
discussion, infra.

applicable portion of that tariff provided that the water company "shall not in any way or under any circumstances be held responsible . . . for any deficiency in the pressure, . . . or supply of water due to any cause whatsoever."  478 A. 2d at 1305. In finding that this provision did not insulate the water company from damages for negligence the court first noted that prior case law (including Behrend I ) did not control. The court stated "[t]his case, however, is not governed by our holding and reasoning in Behrend I. For while Behrend I involved what was clearly a limitation of liability, this case involves what is just as clearly an exculpatory clause." DeFrancesco, 478 A.2d at 1306.[10]

The limitation clause in the contract between Sullivan and Valhal is similar to the clause in Behrend I in that it provides a reasonable allocation of risks between private parties without insulating the beneficiary of the clause from liability.  Since Pennsylvania courts allow a public utility to contractually limit its liability in a matter involving the Public Utilities Commission we fail to see how Pennsylvania public policy prohibits the instant limitation clause.

Valhal also argues that Pennsylvania's licensure requirement for architects evidences a public interest in the private contracts of architects. See Brief of Valhal Corp. at 31–36. 63

_____

[10] We note that the court in DeFrancesco and Behrend discussed the relevance of the Public Utility Commission's duty to assess the reasonableness of such tariff provisions. However, we do not feel that role played by the PUC lessens the relevance of those cases to the facts before us here.

Pa. Cons. Stat. Ann. § 34.3 (Purdons 1994) does provide that the purpose of the licensure requirement for architects is to "protect the health, safety and property of people of the Commonwealth. . . and to promote their welfare. . . ." However, that requirement, without more, cannot convert a private dispute into a matter of public concern. Frampton v. Dauphin Distribution Servs. Co., et. al., 648 A.2d 236 (Pa. Super. 1994). In Frampton, two workers were electrocuted when scaffolding contacted overhead power lines during a construction job. Their estates sued the contractor and the architectural firm it had contracted with. The architectural firm had prepared the construction drawings, but had limited its obligation to preparation of documents. Plaintiffs maintained that the architectural firm had been negligent in failing to warn of the overhead power lines, or to take any steps to minimize the danger. In upholding the trial court's grant of summary judgment in favor of the architectural firm, the Superior Court noted

> Pennsylvania courts . . . have refused to
> impose a duty on an architect to protect
> workers from hazards on a construction site
> in the absence of an undertaking by the
> architect, either by contract or course of
> conduct, to supervise and/or control the
> construction and to maintain safe conditions
> on the construction site.

*Id.* at 328.

Accordingly, we conclude that Pennsylvania law does not charge Sullivan with any generalized duty to the public which could elevate its private contracts to matters of public concern. Valhal suggests that "[t]here is a clear public interest in

regulating professionals and their dealings with the public that prevents professionals from limiting their liability under the stringent standards set forth by the Pennsylvania Supreme Court. See Employers Liability Assurance,. . . 224 A.2d at 622–23 (1966)." Brief of Valhal at 32. However, in pressing this point Valhal persists in failing to accord proper significance to the difference between the "stringent standards" established for exculpatory clauses, and the policy favoring reasonable limitation of liability clauses which "strik[e]. . . a balance of 'benefits and burdens.'" Behrend I, 363 A.2d at 1165. The clause in Employer's Liability Assurance provided that "[The owner] shall not be responsible . . . for any damages occurring to the property of [Lesee]". 224 A.2d at 621. Thus, that clause was remarkably like the one in DeFrancesco. It is just as surely not like the clause in Behrend I or the one before us.

## III. The Limitation Provision Can Not Be Limited to the Negligence Claim.

The jury found Sullivan liable on both the negligence and the breach of contract claims, but awarded damages only on the contract claim. Valhal contends that even if the limitation of liability provision is enforceable, it applies only to its negligence action and not its breach of contract action.

Valhal attempts to draw support for this argument from a decision of the Arkansas Supreme Court which concerned a limitation of liability clause almost identical to the clause here. Brief of Valhal, at 22–24. In W. William Graham, Inc. v.

Cave City, 709 S.W.2d 94 (Ark. 1986), a city sued a design engineer for damages for breach of contract in connection with the preparation of plans for a wastewater treatment facility. The design engineer contended that the contract contained a valid and enforceable limitation of liability clause which prohibited the city from recovering more than $99,214, which was his total fee for the project. The limitation of liability clause provided:

> The OWNER agrees to limit the ENGINEER'S liability to the OWNER and to all Construction Contractors and Subcontractors on the Project, due to ENGINEER'S professional negligent acts, error or omissions, such that the total aggregate liability of the ENGINEER to those named shall not exceed Fifty Thousand Dollars ($50,000.00) or the ENGINEER'S total fee for services rendered on this project, whichever is greater.

However, the Arkansas Supreme Court did not decide the enforceability of this provision. Instead, it held that the clause only covered the engineer's negligence and was not applicable to any damages which resulted from a breach of contract. Id. at 96.

However, the contract at issue stated that the engineer was to provide the plans to the city within 135 days, and it was clear that time was of the essence because delay would result in a substantial reduction of the city's funding for the project. Despite the fact that both the city and the engineer clearly understood that time was of the essence of the contract, the

engineer did not have the plans ready on time and the city lost in excess of $300,000 in funding. Id. at 95.

There were no allegations that the engineer was professionally negligent in his preparation of the plans or that the plans themselves were defective. Accordingly, the engineer could not assert the provision which limited his liability for negligently performing the contract.

Under Pennsylvania law there are two separate lines of reasoning employed by courts in determining whether a cause of action, although arising from a contractual relationship, should be brought in contract or in tort.  The first line comes from the Pennsylvania Superior Court's opinion in Raab v. Keystone Ins. Co., 412 A.2d 638 (Pa. Super. 1979), which involved a claim that the insurance company negligently failed to pay benefits under a no-fault automobile insurance policy and that an agent of the company maliciously interfered with the contractual relationship between the policyholder and the carrier.  The court wrote:

> Generally, when the breach of a contractual relationship is expressed in terms of tortious conduct, the cause of action is properly brought in assumpsit and not in trespass.  However, there are circumstances out of which a breach of contract may give rise to an actionable tort.  The test used to determine if there exists a cause of action in tort growing out of a breach of contract is whether there was an improper performance of a contractual obligation (misfeasance) rather than a mere failure to perform (nonfeasance).

*Id.* at 187–88.  Under the Raab line of reasoning, if there has been a complete failure to perform a contract, the action lies in assumpsit, while if there has been an improper performance, the action lies in tort.  See also Hirsh v. Mount Carmel Dist. Indus. Fund, Inc., 526 A.2d 422, 423 n. 2 (Pa. Super. 1987).   Under the second line, the misfeasance/nonfeasance distinction is not pursued.  Rather, the nature of the wrong ascribed to the defendant "[is] the gist of the action, the contract being collateral." Grode v. Mutual Fire, Marine, and Inland Ins. Company, 623 A.2d 933, 935 n. 3 (Pa. Cmwlth. 1993) (quoting Closed Circuit Corp. v. Jerrold Elec., 426 F. Supp. 361, 364 (E.D. Pa. 1977)).  Thus, if the harm suffered by the plaintiff would traditionally be characterized as a tort, then the action sounds in tort and not in contract.

Here, Sullivan's omission of the height restriction was undoubtedly professional negligence, and all of Valhal's damages flowed from that negligence.  Sullivan did not totally fail to perform (nonfeasance). Rather, in performing, it negligently omitted the height restriction (misfeasance). Valhal bottomed its negligence and breach of contract counts on that omission.  If Sullivan's conduct is viewed under either the "misfeasance/nonfeasance" theory or "gist of the action" theory, the result in the same.  Although Valhal crafted a count against Sullivan in contract, Valhal suffered its loss because of Sullivan's negligence.  Thus, Valhal can not escape the terms of its own contract by attempting to recast the theory of its case so as to avoid the limitation of liability clause.

**IV.**

The jurisdiction of the district court was based solely on diversity. Diversity jurisdiction requires an amount in controversy in excess of $50,000 excluding fees and costs. 28 U.S.C. §1332(a). "This provision must be narrowly construed so as not to frustrate the congressional purpose behind it: to keep the diversity caseload of the federal courts under some modicum of control." Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1044-45 (3d Cir.), *cert. denied*, ___ U.S. ___, 114 S.Ct. 440 (1993). Because we have concluded that the limitation of liability clause is an enforceable part of the contract which is the basis of this diversity action, Valhal's maximum possible recovery is $50,000. Therefore, the district court was without subject matter jurisdiction to hear this controversy. Accordingly, we will vacate the order of the district court and remand with directions to dismiss for lack of subject matter jurisdiction.