NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2041
_____

ROBBIE B. POLLOCK,
Appellant

v.

THE CITY OF PHILADELPHIA;
TYRONE COOK; JAMES CLARK;
SYLVESTER JOHNSON, IN THEIR
INIDIVIDUAL CAPACITIES

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 06-cv-4089)
District Judge: Hon. Thomas J. Rueter
_____

Submitted Under Third Circuit LAR 34.1(a)
December 13, 2010

Before: RENDELL, JORDAN and HARDIMAN, *Circuit Judges*.

(Filed: December 14, 2010)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Robbie B. Pollock appeals from an order of the United States District Court for the

Eastern District of Pennsylvania granting summary judgment for Appellees James Clark

and Sylvester Johnson on Pollock's First and Fourth Amendment claims. Pollock also appeals from the District Court's oral rulings of February 23, 2007, and May 17, 2007, setting forth procedures for deposing Johnson. For the following reasons, we will affirm.

## I.    Background[1]

This case arises out of Pollock's employment with the City of Philadelphia Police Department (the "PPD") and his response to the treatment he received during the course of that employment. From 1999 to 2004, Pollock, an African-American male, worked as a custodian in the PPD's Northwest Detective Division. In early 2004, Sergeant Tyrone Cook, who is also African-American, became Pollock's supervisor. Cook repeatedly mistreated Pollock. In particular, Cook would curse at Pollock, alter Pollock's timecard and report him absent, call Pollock names and refer to him in racially derogatory terms, and deliberately create messes in areas that Pollock had just cleaned so that Pollock would have to re-clean the area.

On July 30, 2004, Cook's antagonism caused Pollock to suffer a stress-related illness, resulting in his hospitalization. Pollock was prescribed medication for the stress, but Cook told him that he would be disciplined for drug use in the workplace if he took it while at work. Pollock complained to Cook's supervisor, Lieutenant James Clark, about Cook's behavior, and Clark replied that he would help Pollock. PPD personnel had observed Pollock get stressed out and agitated from his interactions with Cook, and Clark acknowledged that he needed to resolve the situation before Pollock "snap[ped]". (App.

---

[1] Because we are reviewing a grant of summary judgment, we recount the background information here in the light most favorable to the non-movant, Pollock.

at 118.)  It is unclear whether Clark spoke with Cook, but, in any event, Cook's treatment of Pollock seemed to worsen.

On September 15 and 16, 2004, Pollock took two days of leave to deal with his job-related stress.  On September 17, 2004, Pollock concluded that he "couldn't take it anymore" and called the Northwest Detective Division.  Pollock eventually spoke to Clark, telling him:  "You tried to pull [Cook] off of me.  You tried to stop him, but it didn't work.  Tell him I'm coming to see him."[2]  (App. at 130-31.)

When the call ended, Clark discussed Pollock's call with Cook and Captain Kirkland.  The officers laughed a bit about the call but decided that Pollock might pose a threat to Cook and, fearing a "bad scene," ordered the building secured.  (App. at 500.) Having been told by Clark about Pollock's call, Detectives Betancourt, Swinton, and Grace agreed to engage Pollock in an attempt to de-escalate the situation.

Betancourt called Pollock and agreed to meet him in a parking lot across the street from the police building.  The detectives and Clark then went to the parking lot, where they found Pollock unarmed, non-threatening, and lethargic from having taken a large quantity of Valium.  Pollock said he wanted to see Cook, but the detectives persuaded Pollock to walk to a nearby fire station, and an ambulance took Pollock to the hospital, where he was treated for a drug overdose.

---

[2] The police investigation report regarding that conversation recounts it somewhat differently.  According to that report, Pollock told Clark, "Lieutenant I always liked you, and you always treated me with respect but Cook's got to go, I just tried to kill my wife and I just took a bunch of Pills/Valiums to kill my self [sic] but before I go I am coming to get Cook, I'll see you in twenty minutes."  (App. at 373.)

3

Meanwhile, seeing that Pollock's car was parked illegally, Grace moved Pollock's car to the police lot. Once there, Grace conducted an inventory search of Pollock's car and found in the trunk a plastic bag with green leaves. While he initially suspected it to be marijuana, later testing confirmed that the substance was green tea.

Clark and other police officers spoke with the District Attorney's Office about the incident. The District Attorney's Office approved charges against Pollock for making terroristic threats. Accordingly, later that day, Pollock was transported back to the station and arrested for making terroristic threats against Cook in violation of 18 PA. CONS. STAT. ANN. § 2706.[3] Police Commissioner Sylvester Johnson subsequently recommended that Pollock be dismissed.

On September 21, 2004, an officer from the PPD's Internal Affairs Division met with Pollock to give him notice of a 30-day suspension with intent to terminate his employment. The notice stated that Pollock was accused of making terroristic threats and that marijuana was found in the trunk of his car. On October 20, 2004, the PPD dismissed Pollock.[4]

Pollock was tried twice on the terroristic threat charge. In the first trial, he was found guilty. Pollock successfully appealed that verdict and, in the second trial, was acquitted.

---

[3] In documenting the incident, the PPD generated reports that conflicted on whether Pollock was secured for his own safety or for general safety reasons.

[4] The notice of dismissal again stated that marijuana had been seized from Pollock's vehicle, even though the lab results had, at that point, revealed otherwise.

In September 2006, Pollock sued the City of Philadelphia, Johnson, Cook, and Clark under 42 U.S.C. §§ 1981 and 1983, alleging violations of his First, Fourth, and Fourteenth Amendment rights. During the course of the litigation, Pollock sought to depose Johnson, but Johnson resisted, citing his busy schedule.[5] The District Court determined that Pollock could submit written questions to Johnson under Rule 31 of the Federal Rules of Civil Procedure and stated that Pollock could request an oral deposition if Johnson's written testimony was insufficient. On June 10, 2007, Johnson submitted answers to Pollock's questions.

When the defendants moved for summary judgment, Pollock of course opposed it and, at the same time, renewed his request to depose Johnson. The District Court denied summary judgment to Cook on Pollock's Fourteenth Amendment claim but otherwise granted the defendants' motion. The District Court also denied Pollock's renewed request to depose Johnson, reasoning that it was untimely made. After a jury found in favor of Cook on the Fourteenth Amendment claim, the District Court entered final judgment against Pollock on March 10, 2010. This appeal followed.

## II.    Discussion[6]

Pollock appeals the grant of summary judgment as to his First Amendment retaliation claims against Clark and Johnson and his Fourth Amendment claim against

---

[5] Pollock had, at that point, already taken ten depositions and was seeking leave to take twelve more.

[6] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

Clark. He also appeals the denials of his requests to depose Johnson. We address each of those points in turn.[7]

> ### A. First Amendment Retaliation Claims Against Clark and Johnson

To establish a First Amendment claim for unlawful retaliation, a plaintiff must show that the conduct that led to the alleged retaliation was constitutionally protected, the plaintiff was subjected to adverse actions by a state actor, and the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. *See Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997).

---

[7] With respect to the District Court's grant of summary judgment, our review is de novo, and "we apply the same standard as the District Court in determining whether summary judgment was appropriate." *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citations omitted). Summary judgment can properly be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c)(2). A factual dispute is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party … . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986); *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) ("[A] non-moving party … cannot simply reassert factually unsupported allegations contained in its pleadings."). We assume that the non-moving party's allegations are true and give the non-moving party the benefit of the doubt when those allegations conflict with the moving party's claims. *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995). However, summary judgment must be entered against any party unable to present sufficient evidence in support of an essential element of a claim because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

With respect to the District Court's denial of Pollock's deposition request, we review for abuse of discretion. *See Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991).

6

Pollock's claims fail because he cannot establish the third element, namely, that his racial discrimination complaint motivated either Clark or Johnson to take any adverse action.[8] To prove that a protected activity motivated an adverse action, a plaintiff must, as a threshold matter, prove that the adverse actor knew of the protected activity. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). If the plaintiff can prove that, then the plaintiff must prove a causal link between the adverse action and the protected activity, usually by showing either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A causal link may also be shown by demonstrating that the record as a whole supports such an inference. *Id.*

Here, the record contains no evidence of a causal link between Pollock's complaint and any adverse action by Clark or Johnson. First, the record indicates that approximately six weeks elapsed between Pollock's complaint and the first alleged retaliatory action. We agree with the District Court that the timing here does not indicate a causal link. *Cf. Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (holding that a three-week period between the time of a harassment complaint and dismissal was not "unusually suggestive temporal proximity"). Second, there is no evidence that Clark or Johnson was ever antagonistic towards Pollock; in fact, Pollock's own testimony indicates that Clark had a positive relationship with Pollock and had tried

---

[8] Because Pollock's First Amendment claims fail on that third element, we need not opine on the merits of his arguments as to the first two elements.

to help him.  Finally, although the record shows that there were inconsistencies in the investigation leading to Pollock's termination, there is no evidence that Clark or Johnson was responsible for those inconsistencies or that the termination was motivated by a desire to retaliate against Pollock for his complaint.  In fact, the record contains no evidence that Johnson even knew of Pollock's complaint.  Accordingly, it was proper for the District Court to grant summary judgment for Clark and Johnson on the First Amendment retaliation claims.

B.     *Qualified Immunity on Fourth Amendment Claim Against Clark*

To establish a Fourth Amendment claim for false arrest, Pollock must show that Clark lacked probable cause to arrest him.  *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988).  "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."  *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). "The validity of an arrest is determined by the law of the state where the arrest occurred." *Id.*

The Pennsylvania terroristic threats statute provides:

A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:

> (1) commit any crime of violence with intent to terrorize another;
>
> (2) cause evacuation of a building, place of assembly or facility of public transportation; or

8

(3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience.

18 PA. CONS. STAT. ANN. § 2706(a). In determining whether a communication constitutes a terroristic threat, "[w]e need not look at the [allegedly threatening] statement in a vacuum. Rather, we will consider the statement in light of the surrounding circumstances." *Commonwealth v. Griffin*, 456 A.2d 171, 174 (Pa. Super. Ct. 1983). A person may violate § 2706 even if he fails to articulate exactly what violent or inconvenience-causing act he intends to commit and even if he cannot actually carry it out. *Commonwealth v. Sinnott*, 976 A.2d 1184, 1188 (Pa. Super. Ct. 2009). Additionally, the defendant need not communicate directly with the alleged victim, and the alleged victim need not believe that the defendant will actually carry out the threatened action. *Id.*

The question of probable cause in this case is a close one, but we need not resolve it because, even if probable cause were lacking, Clark is entitled to qualified immunity in connection with Pollock's arrest. We use a two-prong analysis to determine whether a government official is entitled to qualified immunity. *Pearson v. Callahan*, 129 S.Ct. 808, 815, 818 (2009). First, we "decide whether the facts … shown … make out a violation of a constitutional right." *Id.* at 815-16 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, we "decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 816 (quoting *Saucier*, 533 U.S. at 201). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640

9

(1987)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* at 815 (internal quotation marks omitted).

Assuming *arguendo* that Clark violated Pollock's Fourth Amendment right by having him arrested without probable cause, Clark is still entitled to qualified immunity under the second prong of the qualified immunity analysis. At the time of the arrest, Pennsylvania law provided that terroristic threats must be determined from context, and the law was not so clearly established with respect to the context marking terroristic threats that Clark should have known that Pollock's actions did not rise to the level of violations under § 2706. Indeed, this is borne out by Clark's having sought and received approval from the District Attorney's Office before arresting Pollock. We agree with the District Court that "[t]he situation defendant Clark faced was sufficiently unusual, and the warning signs presented [were] sufficiently serious, that a reasonable official would not have understood that he was violating the law in arresting [Pollock]." Memorandum in Support of Order Granting Summary Judgment at 40, *Pollock v. City of Philadelphia*, No. 06-4089 (E.D. Pa. Aug. 7, 2008). Accordingly, we conclude that summary judgment for Clark on the Fourth Amendment claim was proper.

C.    *The Requests to Depose Johnson*

The conduct of discovery is "committed to the sound discretion of the district court." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982). We defer to the district court's management of discovery, absent either "the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant …

10

[or] a demonstration that the court's action made it impossible to obtain crucial evidence." *Id.* at 817-18 (internal quotation marks omitted).

Pollock cannot make such a showing here. The District Court's procedure with respect to deposing Johnson afforded Pollock ample opportunity to obtain evidence from Johnson, first in the form of written submissions and then, if necessary, in the form of an oral deposition. It was not at all impossible under that procedure to obtain evidence from Johnson, and any prejudice that might have occurred from ultimately being unable to orally depose Johnson is of Pollock's own making, as he failed to renew his request until after summary judgment briefing had commenced. On this record, the District Court was within its discretion in its handling of Pollock's requests to depose Johnson.

## III.    Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment and the denial of Pollock's requests to depose Johnson.

11