**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| ANTHONY DEGLIOMINI AND KAREN DEGLIOMINI, | : | No. 5 EAP 2020 |
| | : | |
| | : | Appeal from the Order of |
| Appellants | : | Commonwealth Court dated |
| | : | 06/25/2019 at No. 1573 CD 2018, |
| | : | reversing the 10/24/2018 Order of |
| v. | : | the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| | : | No. 01601 April Term, 2016. |
| ESM PRODUCTIONS, INC. AND CITY OF | : | |
| PHILADELPHIA, | : | ARGUED:  September 15, 2020 |
| | : | |
| Appellees | : | |

## OPINION

**JUSTICE DOUGHERTY**                                    **DECIDED:  June 22, 2021**

We granted discretionary review to consider the validity of an exculpatory release signed by a participant in a charity bike ride that purports to immunize the City of Philadelphia from liability for breaching its duty to repair and maintain public streets. We hold such a release is unenforceable because it violates public policy, and we therefore reverse.

### I. Factual and Procedural Background

Appellant Anthony Degliomini participated in the May 2015 Philadelphia Phillies Charity Bike Ride (Bike Ride), a twenty-mile ride along a designated route through the streets of South and Center City Philadelphia. During the Bike Ride, Degliomini crashed when he rode into an unmarked and un-barricaded sinkhole on Pattison Avenue in South Philadelphia, which measured sixteen square feet in area and six inches deep. As a result

of the crash, Degliomini suffered severe and extensive injuries, including spinal cord injuries leading to incomplete quadriplegia,[1] and multiple bone fractures which required surgical procedures and extensive and ongoing medical treatment. Complaint at ¶¶3-4. Degliomini and his wife, Karen Degliomini (appellants), filed a negligence action against the City of Philadelphia (the City), event planner ESM Productions, and several other defendants.[2]

The parties litigated pre-trial motions seeking, *inter alia*, to dismiss appellants' claims against the City due to governmental immunity pursuant to the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§8541-8564 (Tort Claims Act), and to bar appellants' claims of negligence on the basis of the 2015 Phillies Charities Bike Ride Release (the Release), an exculpatory contract prepared by ESM Productions and signed by Mr. Degliomini. The Release states, in relevant part:

> I know that participating in an organized bike ride such as the 2015 Phillies Charities Bike Ride is a potentially hazardous activity. I should not enter and bike unless I am medically able and properly trained. I understand that bicycle helmets must be worn at all times while participating in the event and I agree to comply with this rule. I further understand and agree that consumption of alcoholic beverages while operating a bicycle is a violation of the law and strictly prohibited. I know that there will be traffic on the course route and I assume the risk of biking in traffic. I also assume any and all other risks associated with participating in the event, including but not limited to falls; contact with other participants; the effects of the weather; the condition of the roads; and unsafe actions by other riders, drivers, or non-participants. I consent to emergency medical

---

[1] Incomplete quadriplegia is a condition defined by partial damage to the spinal cord resulting in weakness and decreased sensation in the arms and legs, but the injured person retains some function below the level of the injury. *See* N.T. 2/26/2018 at 123, 140.

[2] Prior to trial, appellants settled with ESM and dismissed the additional defendants; the trial proceeded against the City as the sole remaining defendant. *See Degliomini. v. Philadelphia Phillies,* No. 1601, 2018 WL 11243021 at *1 (C.P. Philadelphia, Oct. 24, 2018).

care and transportation in the event of injury, as medical professionals deem appropriate.

All such risks being known and appreciated by me, and in consideration of the acceptance of my entry fee, I hereby, for myself, my heirs, executors, administrators and anyone else who might claim on my behalf, promise not to sue and I release and discharge The Phillies, Phillies Charities, Inc., any and all sponsors of the event, the City of Philadelphia, Philadelphia Authority for Industrial Development, Philadelphia Industrial Development Corporation, ESM Productions, and each of their respective affiliates, owners, partners, successors and assigns and each of their respective officers, employees, agents, and anyone acting for or on their behalf, and all volunteers (collectively, the "Releasees"), from any and all claims of liability for death, personal injury, other adverse health consequence, theft or loss of property or property damage of any kind or nature whatsoever arising out of, or in the course of, my participation in the event even if caused by the negligence of any of the Releasees. This Release extends to all claims of every kind or nature whatsoever.

*          *          *

I, intending to be legally bound, represent that I am at least eighteen years old; either I am registering to enter this event for myself or as a parent or guardian of a minor who is at least thirteen years old; I have carefully read and voluntarily agree to this Release on behalf of myself and, if applicable, the minor who is being registered to participate, and I understand its full legal effect.

Trial Court Exhibit D-4. Appellants responded the City was not entitled to statutory immunity because an exception for dangerous conditions on City-owned streets applied;[3]

---

[3] The Tort Claims Act provides, in relevant part, as follows:

**(b) Acts which may impose liability. --** The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

*          *          *

(6) *Streets.* --

(i) A dangerous condition of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of

the City breached its duty to maintain and repair City streets as provided in Philadelphia's Home Rule Charter;[4] the Release should not apply to bar their claims because the sinkhole existed well before the Bike Ride and therefore the City's negligence occurred before the Release was ever signed; and the Release was unenforceable because it violates public policy by improperly immunizing the City from any consequence of breaching its duty of public safety imposed by the Home Rule Charter.

The trial court rejected the City's argument that the negligence action was barred by the Release, and the matter proceeded to a jury trial. Appellants presented civil engineering and roadway management expert testimony from Richard Balgowan, a forensic engineer and certified public works manager, who stated the sinkhole existed in October 2014, approximately eight months prior to the Bike Ride. *See* N.T. 2/27/2018 at 26, 45-47. Appellants' evidence further demonstrated the City had knowledge of the sinkhole as it had previously applied patching material to fill it months prior to the Bike

---

the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa.C.S. §8542(b)(6)(i).

[4] Philadelphia's Home Rule Charter provides, in pertinent part, as follows:

The Department of Streets shall have the power and its duty shall be to perform the following functions:

(a) City Streets.  It shall . . . repair and maintain:

(1) City streets, which shall include highways, roads, streets, alleys . . . owned, controlled or operated by the City or designated in accordance with law as streets of the City;

*       *       *

Philadelphia Home Rule Charter §5-500(a)(1).

Ride, but did not block the area or complete the repair to the subterranean void causing the pavement to sink. *See id.* at 30-35 (expert testimony discussing different texture and color of material in sinkhole indicated someone from streets department attempted to temporarily fill the sinkhole but did not complete a standard repair). The jury concluded the City was negligent and awarded $3,086,833.19 in damages to Mr. Degliomini and $100,000 to Mrs. Degliomini for her loss of consortium.[5]

The parties filed post-trial motions. Appellants sought and were awarded delay damages; the City moved for judgment notwithstanding the verdict (JNOV) based on the Release, which was denied. The trial court explained the Tort Claims Act specifically imposes an exception to immunity when the City has actual or constructive notice of a dangerous condition of the streets, and, under the Home Rule Charter, the City has a mandatory duty to maintain and repair City streets, which was breached and caused damages to appellants. *Degliomini v. Philadelphia Phillies,* 2018 WL 11243021 at *2-4. Specifically, relying on appellants' unrebutted expert evidence that the City placed patch material in an attempt to fill the sinkhole without repairing the underground void that created the sinkhole, the trial court determined the City's actions in negligently undertaking to repair the sinkhole resulted in a non-waivable "catalyst for liability" which existed months prior to preparations for the Bike Ride. *Id.* at *3 (internal quotations and citation omitted). The court thereby concluded the Release was not valid as it violated public policy by exculpating the City from liability for conduct that breaches its exclusive duty to the public set forth in the Home Rule Charter. *See id.* at *6-8, *quoting Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1189 (Pa. 2010) ("It is generally accepted that an exculpatory clause is valid where three conditions are met. First,

---

[5] The jury allocated 90% of the negligence to the City and 10% to ESM. *See Degliomini v. Philadelphia Phillies*, 2018 WL 11243021 at *1.

the clause must not contravene public policy."). The trial court entered judgment on the verdict which was molded to include delay damages, and a reduction to reflect the statutory cap.[6] The City filed an appeal.

A three-judge panel of the Commonwealth Court reversed. *Degliomini v. ESM Prods., Inc.*, No. 1573 C.D. 2018, 2019 WL 2587696 (Pa. Cmwlth., June 25, 2019) (unpublished memorandum). Though the panel agreed the dispositive issue regarding the validity of the Release was whether it contravenes public policy, it also observed Pennsylvania courts have consistently upheld exculpatory releases pertaining to recreational activities as non-violative of public policy, and therefore valid and enforceable. *See id.* at *3 (collecting cases). Rather than considering Section 5-500 of the Philadelphia Home Rule Charter as establishing a mandatory duty, the panel regarded it instead as an "organizational section" mandating the creation of the Department of Streets to perform certain functions, but providing no standard of care or guidelines for how the Department must accomplish its road repair duties; thus, the panel reasoned the City's street maintenance obligation under the Charter was no different than any common law duty of reasonable care, which can be waived via a valid release. *Id.* at *4. The panel relied on its decisions in *Vinikoor v. Pedal Pa., Inc.*, 974 A.2d 1233, 1240 (Pa. Cmwlth. 2009) (release precluded recovery against self-inflicted injuries caused by known risks on road during bike race and did not violate public policy), and *Scott v. Altoona Bicycle Club*, No. 1426 C.D. 2009, 2010 WL 9512709 at *4-5 (Pa. Cmwlth., July 16, 2010) (unpublished memorandum) (exculpatory agreement between bike race participant and municipality was a private agreement and did not violate public policy), to

---

[6] *See* 42 Pa.C.S. §8553(b) ($500,000 limitation on damages against local agencies). The final judgment entered was $521,544.52 in damages against the City. *Degliomini v. Philadelphia Phillies,* No. 1601, 2018 WL 11243022 at *1 (C.P. Philadelphia, Nov. 20, 2018) (amended order).

conclude: the Release was a private agreement between appellant Degliomini and various entities including the City; appellant was under no obligation to sign the Release or participate in the Bike Ride; and the Bike Ride was a private event on public roads and the City's involvement was akin to that of a private property owner. *Id.* The Commonwealth Court therefore held, because the Release did not violate public policy, it was valid and enforceable to bar appellants' claims against the City, and the trial court erroneously denied the City's request for JNOV. *Id.*

Upon appellants' petition, we granted review of the following questions:

1.  Can the City of Philadelphia contractually immunize itself from tort liability for breaching a mandatory public safety duty which has existed for decades under common law, and which is now codified and/or imposed under Pennsylvania's Tort Claims Act and Philadelphia's Home Rule Charter?

2.  Does the Phillies' exculpatory Release immunize the City from liability for negligently repairing its road hazard before the parties drafted or entered the Release, and long before the event covered by the Release?

*Degliomini v. ESM Prods., Inc.*, 223 A.3d 670 (Pa. 2020) (*per curiam*). These are pure questions of law over which our standard of review is *de novo* and our scope of review is plenary. *See Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1093 (Pa. 2012). For the most part, the parties treat the two issues as intertwined, and we proceed to consider their arguments mindful of the applicable standard.

## II. Arguments

In support of the trial court's determination the Release is unenforceable as against public policy, appellants argue that only the legislature has the authority to confer immunity upon political subdivisions and, by enacting the Tort Claims Act, the legislature expressly determined cities "shall be liable for damages" resulting from known dangerous

street conditions; therefore, according to appellants, the City cannot immunize itself by contract for conduct where the legislature has expressly waived its immunity. Appellants' Brief at 12-17, *quoting* 42 Pa.C.S. §8542(a). *See id.*, *citing*, *inter alia*, *Carroll v. York Cty.*, 437 A.2d 394, 396 (Pa. 1981) (extent of a municipality's powers is determined by the legislature); *Dorsey v. Redman*, 96 A.3d 332, 340 (Pa. 2014) (legislature is the exclusive body with authority to confer immunity upon political subdivisions); *City of Philadelphia v. Gray*, 633 A.2d 1090, 1093-94 (Pa. 1993) (city ordinance cannot waive immunity conferred by Tort Claims Act). Recognizing the purpose of the Tort Claims Act's immunity provision is to protect against public fiscal risks, appellants observe the Judicial Code explicitly provides both a statutory limitation on damages against a local agency, and the authority for local agencies to purchase liability insurance and enter joint insurance contracts in order to mitigate risk exposure. Appellants further note, however, the Code does not mention exculpatory contracts. *Id.* at 16-17 n.5. *See* 42 Pa.C.S. §§8553, 8564. Appellants contend there is an important distinction between permissible indemnity contracts wherein another party agrees to bear cost of damages if the government is held liable, and exculpatory contracts wherein the government would be immunized from being held liable at all, which is not permissible under these circumstances because the legislature foreclosed the defense of tort immunity via the Act's exception for known dangerous street conditions. *Id.* at 17.

In addition, appellants indicate exculpatory clauses have been found to violate public policy when, *inter alia*, they release a party charged with a duty of public service, release a party for violating a statute or regulation designed to protect human life, or "'would jeopardize the health, safety, and welfare of the people by removing any incentive

for parties to adhere to minimal standards of safe conduct.'" *Id.* at 19-22, *quoting Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1203 (Pa. 2012). *See id.*, *citing*, *inter alia*,; *Boyd v. Smith*, 94 A.2d 44, 45-46 (Pa. 1953) (lease contract exculpating landlord from liability "caused by any fire" violated public policy where landlord did not comply with fire safety legislation "intended for the protection of human life"); *Leidy v. Deseret Enters., Inc.*, 381 A.2d 164, 167-68 (Pa. Super. 1977) ("courts have found contracts against liability contrary to public policy . . . in situations where one party is charged with a duty of public service") (additional citations omitted). They assert the City has a mandatory, non-delegable "public safety" duty to repair street hazards upon actual or constructive notice of them, and this duty has existed at common law for decades. *See id.* at 18, *citing*, *inter alia*, *Drew v. Laber*, 383 A.2d 941, 943 (Pa. 1978) ("Under Pennsylvania law a municipality is required to construct and maintain its highways in such a manner as to protect travelers from dangers which, by the exercise of normal foresight, careful construction and reasonable inspection, can be anticipated and avoided.") (internal quotation omitted). They further assert this duty was later preserved and codified in the Philadelphia Home Rule Charter — which has the force of statute and expressly states the City's Department of Streets has the duty to repair and maintain city streets — and the Tort Claims Act — which contains the exception to governmental immunity for dangerous street conditions. *See id.* at 27-29, *citing Harrington v. Carroll*, 239 A.2d 437, 438 (Pa. 1968) ("That the [Philadelphia Home Rule] Charter constitute[s] legislation no less than does a statute of the legislature to like end is too plain for even cavil."); Philadelphia Home Rule Charter §5-500(a)(1); 42 Pa.C.S. §8542(b)(6)(i). Appellants indicate this duty is not a sweeping source of liability for all dangerous street conditions,

but, per the statutes, is instead a bare minimum duty of care that attaches to liability only when the City "'had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.'" *Id.* at 21-22, *quoting* 42 Pa.C.S. §8542(b)(6)(i). They argue that allowing *ad hoc* contract exceptions to the legislative waiver of immunity would disincentivize the City from discharging its bare minimum duty of care at the precise time when the City's known or reasonably knowable street hazards pose the most danger — *i.e.*, during events, when streets are congested with onlookers and event participants — and would thereby "jeopardize the health, safety, and welfare of the people[.]" *Id.* at 22, *quoting Tayar*, 47 A.3d at 1203.

Appellants further emphasize the City's duty to maintain public streets is distinct from the duty of owners of private property such as a race track or ski resort hosting a non-essential sporting event, contending the legislature stripped the City of tort immunity for breaching this specific duty under the Tort Claims Act streets exception. And, in contrast to other cases where exculpatory contracts conditioning recreational use of private property upon the execution of a release did not violate public policy, the City's duty to maintain and repair the street does not arise from use of the property conditioned upon execution of the Release, but exists independently from the Release and the Bike Ride event to ensure public safety. As a result, argue appellants, the duty cannot be waived by contract. *See id.* at 23-25, *comparing Boyd*, 94 A.2d at 45-46 (liability for breaching public safety duty to provide fire escape could not be waived by contract between a landlord and tenant) *with*, *e.g.*, *Chepkevich*, 2 A.3d 1174 (alleged duty arose

from plaintiff's use of defendant's ski facility which was conditioned upon her first signing an exculpatory release); Appellants' Reply Brief at 10.

Lastly, appellants argue that exculpatory releases are strictly construed against the party seeking immunity, and the text of this Release is not sufficiently clear to immunize the City for negligence that occurred before the Bike Ride and before the parties entered the Release. *See id.* at 29-30, *citing*, *inter alia*, *Emp'rs Liability Assur. Corp. v. Greenville Bus. Men's Assoc.*, 224 A.2d 620, 623-24 (Pa. 1966) (exculpatory clauses construed against party seeking immunity; "If a party seeking immunity from liability for negligent conduct intends exculpation for past as well as future negligent conduct it is his obligation to express in the agreement such intent in an unequivocal manner; absent a clear expression of intent, the clause of exculpation will not be so construed."). Appellants focus on language in the second paragraph, which releases the City of liability from "claims of liability for . . . personal injury . . . **arising out of, or in the course of,** . . . participation in the event even if caused by the negligence of any of the Releasees." *Id.* at 30, *quoting* the Release (emphasis added by appellants). Appellants view the City's negligence as occurring long before the Bike Ride, when the City patched but failed to complete repair of the sinkhole. Though recognizing the Release contains language that participants assume risks associated with "the condition of roads," appellants contend the phrase cannot reasonably be construed to cover hazardous road conditions for which the City was on notice and which were caused by the City's prior negligent repair of a known dangerous condition that, at a minimum, should have been marked with paint or barriers along the route, consistent with Mr. Degliomini's experience in similar charity bike ride events. *See id.* at 31-32.

In response, the City concedes it has a longstanding duty to maintain its streets for ordinary and essential use, such as everyday walking, bicycling, or driving, but emphasizes the duty was created by common law, not the Tort Claims Act or Home Rule Charter, and — just as any private landowner would be able to do — the City can release itself from liability for breach of that duty by an exculpatory contract involving non-essential, recreational use of the streets. *See* City's Brief at 18-19, 24-25. In support of this position, the City raises two key elements to its argument. First, it argues not enforcing such a release would be contrary to the overriding purpose of the Tort Claims Act, which is to **limit** municipal liability and preserve the public fisc by providing absolute immunity for acts of negligence subject to a few, narrowly-construed exceptions. *Id.* at 19, 21 (emphasis provided by the City); *see id.* at 22-23, *citing Dorsey*, 96 A.3d at 341 ("exceptions to the absolute rule of immunity expressed in the statute must be narrowly interpreted given the expressed legislative intent to insulate political subdivisions from tort liability") (internal citations and quotations omitted). Second, by the express terms of the Act, the General Assembly deliberately placed municipalities on equal footing with private defendants, allowing for liability only if "[t]he damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under [governmental or official immunity]." *See id.* at 24, *quoting* 42 Pa.C.S. §8542(a)(1). The City contends these public policy principles are evident from the explicit text of the Act as well as its legislative history. It was enacted to codify the principle of governmental immunity shortly after this Court abrogated its

common law predecessor.[7] The enactment was based upon recommendations of the Joint State Government Commission tasked with the study of sovereign immunity laws, which described, *inter alia*, the rejection of a general waiver of immunity in favor of the enumeration of limited specific waivers, the difficulty municipalities face in obtaining insurance against risks, the intention to retain immunity as the rule while specific waivers would be the exception, and the intention that these waivers "'merely [ ] remove the bar from suit where the cause of action already exists in the enumerated areas,'" to allow existing causes of action to play out before the courts just as they would against a private defendant. *Id.* at 22-24, 26 *quoting* "Sovereign Immunity," Pennsylvania General Assembly, Joint State Government Commission at 11 (May 1978). As there is no explicit statutory text prohibiting municipalities from limiting their liability through exculpatory contracts, the City contends the Release is consistent with the Tort Claims Act's central goal of limiting liability, and not antagonistic to public policy. *See id.* at 20-21, 25-26.

The City further argues Pennsylvania courts express "great reluctance" to disrupt parties' freedom of contract on public policy grounds, having consistently upheld waivers of liability for ordinary negligence in connection with recreational events like the Bike Ride, and invalidating private contractual agreements only when a "'dominant public policy'" found in "'long governmental practice or statutory enactments, or [ ] obvious ethical or moral standards,'" *id.* at 12-14, *quoting Williams v. GEICO Gov't Emps. Ins. Co.*, 32 A.3d 1195, 1200 (Pa. 2011), sufficiently justifies invalidating the contract, and this is not the case when a policy is merely consistent with one of several competing goals of a statute,

---

[7] *See Ayala v. Philadelphia Bd. of Pub. Educ.*, 305 A.2d 877, 881-83 (Pa. 1973) (abolishing common law defense of governmental immunity).

but rather demands "'a public policy overriding every other consideration in contract construction.'" *Id.* at 26, *quoting Heller v. Pa. League of Cities & Muns.*, 32 A.3d 1213, 1221 (Pa. 2011) (internal quotation omitted). *See id.* at 13-14, *citing*, *inter alia*, *Tayar*, 47 A.3d at 1200 ("exculpatory clauses that release a party from negligence generally are not against public policy"). The City emphasizes that liability waivers for recreational activities do not concern public policy because such activities are voluntary and the signer is under no obligation to participate in the activity. *Id.* at 14-15, *citing*, *inter alia*, *Chepkevich*, 2 A.3d at 1191 ("signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity. . . . The signer is a free agent who can simply walk away without signing the release and participating in the activity") (citations omitted).[8] In the City's view, Mr. Degliomini had complete freedom to reject the Release, and the City was not performing an essential service by hosting the Bike Ride, which did not involve the public's ordinary, essential use of the streets such as an everyday bicycle commute — instead, the Bike Ride was a time-limited event involving hundreds of cyclists moving steadily in a pack without having to stop for traffic lights or stop signs, making it

---

[8] The City additionally references a collection of intermediate appellate court cases which uphold the validity of releases of liability for ordinary negligence in connection with recreational activities, including the two cases relied upon by the Commonwealth Court below relating specifically to organized bicycling events. *See* City's Brief at 14, *citing Toro v. Fitness Int'l LLC*, 150 A.3d 968, 974 (Pa. Super. 2016) (using a fitness club); *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 120-21 (Pa. Super. 2015) (whitewater rafting); *Wang v. Whitetail Mountain Resort*, 933 A.2d 110, 113-14 (Pa. Super. 2007) (snow tubing); *Nissley v. Candytown Motorcycle Club, Inc.*, 913 A.2d 887, 891 (Pa. Super. 2006) (motorcycle riding); *Seaton v. E. Windsor Speedway, Inc.*, 582 A.2d 1380, 1383 (Pa. Super. 1990) (working in pit crew at auto racing track); *Valeo v. Pocono Int'l Raceway, Inc.*, 500 A.2d 492, 493 (Pa. Super. 1985) (automobile racing); *Scott*, 2010 WL 9512709 at *4-5 (bicycling event); *Vinikoor*, 974 A.2d at 1240 (same).

more difficult to see and avoid road hazards. *Id.* at 15-16. The City submits its role in the Bike Ride was identical to that of a host of a private recreational, non-essential event. *See id.* at 16.

The City further asserts there is no broad public policy exception against contracts affecting public safety or reducing incentives to act with due care, and such an exception would cause nearly all exculpatory clauses to violate public policy. Instead, according to the City, non-waivable essential duties or entities "charged with a duty of public service" includes employer-employee relationships and the essential, ordinary use of public utilities, common carriers, and hospitals, but not recreational use of grounds for events such as charity bike rides. *See id.* at 15, *citing* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY §2 cmt. e (2000); *id.* at 16-18 & 17 n. 4, *citing Toro*, 150 A.3d at 973; RESTATEMENT (SECOND) OF CONTRACTS §195 cmt. a (1981). Additionally, the City suggests non-waivable violations of health and safety statutes apply only to regulations setting specific standards of care such that violation of the statute would constitute negligence *per se. See id.* at 17 n.5, *citing*, *inter alia*, *Boyd*, 94 A.2d at 46*; Warren City Lines, Inc. v. United Ref. Co.*, 287 A.2d 149 (Pa. Super. 1971) (violation of Fire Marshal's regulation was negligence per se and could not be waived by contract's exculpatory clause). The City argues enforcing the Release does not implicate any of these public safety concerns; further, cases that have held exculpatory agreements were invalid as violative of public policy for "jeopardiz[ing] the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct" — *Tayar, supra*, and *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 20 (Pa. 2019) — involved claims of recklessness or gross negligence rather than ordinary negligence which is at

issue here, and the City's incentive to repair its roads remains intact because an individual can still sue for a sinkhole-related injury arising from ordinary use of the street outside the parameters of the Release. *See* City's Brief at 18.

Regarding appellants' reliance on the Home Rule Charter, the City argues the Charter is merely organizational and provides the City with the role of repairing roads, but does not create any duty to users of the roads or streets. *See id.* at 27. Because the Home Rule Charter is silent with respect to the question of tort liability and contractual waivers of liability, the City argues the Release does not conflict with any express or implicit policy set forth in the Home Rule Charter. Rather, the City suggests the Release is enforceable because it is an exculpatory contract associated with a voluntary recreational activity.

Finally, the City argues the language of the Release is unambiguous and plainly applies to any personal injury that occurred during the Bike Ride due to a "condition of the roads." *Id.* at 28. Disclaiming appellants' reliance on *Employers Liability*, the City distinguishes its central holding — *i.e.*, a residential lease's language was not sufficiently clear to waive liability for a hidden defect that existed prior to the contract — as limited to the context of leases, in which parties are contemplating a status which will be created in the future after the lessee receives a property free of defects; in contrast, the City argues no reasonable cyclist would expect to receive a public road in perfect condition. *See id.* at 29-30, *citing Employers Liability*, 224 A.2d at 622-24. Moreover, the City indicates the Release does contain specific language that participants waived "'any and all claims of liability . . . even if caused by the negligence of any of the Releasees'" and that participants assumed all risks relating to the "'condition of the roads,'" including all road defects. *Id.* at

31-32, *quoting* the Release. The City asserts it is unreasonable to interpret "condition of the roads" to pertain only to potholes that formed after the Release was signed. *Id.* at 32.[9]

### III. Legal Background

We now turn to our analysis of the issues presented within the context of the applicable legal principles. Importantly, the City does not contest it has a duty derived from common law to maintain its streets for ordinary use by the public; therefore the primary operative question is whether the City may contractually immunize itself against consequences of breaching that duty when the use of the street is a non-essential, voluntary, recreational function. And, because our answer to this question is dispositive, we need not reach the second issue on appeal, regarding the sufficiency of the Release's language to immunize the City from liability for negligence that pre-existed execution of the Release.

A valid exculpatory contract fully immunizes a person or entity from any consequences of its negligence. *See* 57A Am. Jur. 2d Negligence §47; *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995), *citing, e.g., Topp Copy Prods.,*

---

[9] The position articulated by Chief Justice Baer in his dissenting opinion aligns substantially with the arguments advanced by the City, specifically: a municipality may be liable only to the extent that a private defendant would be liable, and a private defendant is free to execute an exculpatory release to limit its risk, *see* Dissenting Opinion at 3; the purpose of the Tort Claims Act is to limit, not expand, municipal liability, *see id.* at 3-4; it is the immunity, not the liability, that is non-waivable, *see id.* at 4; the Home Rule Charter is organizational and expresses no dominant public policy or standard of care nor does it have a remedial purpose, *see id.*; the City's general duty to repair and maintain streets is not akin to a non-waivable health and safety regulation, *see id.* at 5; and, because the City otherwise has a common law duty to maintain and repair its streets, and would remain liable for reckless or grossly negligent conduct, exculpation under the Release for particular enumerated conduct during the event does not jeopardize public safety and welfare, *see id.* at 5-6. There are several points made by the dissent and the City with which our analysis may coexist, and given the similarity of their positions, we primarily address them together.

*Inc. v. Singletary*, 626 A.2d 98, 99 (Pa. 1993). Disfavored under Pennsylvania law, exculpatory contracts are subject to close scrutiny, strictly construed against the party seeking their protection, and enforced only provided certain criteria are met. *See Employers Liability*, 224 A.2d at 623 ("[C]ontracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law . . . such contracts must be construed with every intendment against the party who seeks the immunity from liability[.]") (internal quotations and citations omitted); *Tayar,* 47 A.3d at 1199, 1200 & n.8 (exculpatory clauses "enforceable provided certain criteria are met"), *citing*, *inter alia*, *Topp Copy*, 626 A.2d at 99; *Feleccia*, 215 A.3d at 16. Our courts have recognized that "lying behind these contracts is a residuum of public policy which is antagonistic to *carte blanche* exculpation from liability[.]" *Phillips Home Furnishings, Inc. v. Cont'l Bank.,* 331 A.2d 840, 843 (Pa. Super. 1974), *rev'd on other grounds*, 354 A.2d 542 (Pa. 1976); *see also, e.g.*, *Soxman v. Goodge*, 539 A.2d 826, 828 (Pa. Super. 1988) (contracts providing "*carte blanche*" exculpation from liability are disfavored as contrary to public policy and must be strictly construed). Thus, our longstanding precedent explains that an exculpatory provision is enforceable, but only if it "does not contravene public policy, is between parties relating entirely to their private affairs, and where each party is a free bargaining agent so that the contract is not one of adhesion." *Chepkevich*, 2 A.3d at 1177, *citing Topp Copy*, 626 A.2d at 99; *see also Feleccia*, 215 A.3d at 19; *Tayar*, 47 A.3d at 1199.

Generally speaking, an exculpatory clause withstands a challenge based on public policy if "'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State.'" *Employers Liability*, 224 A.2d at 622-23, *quoting Dilks v. Flohr*

*Chevrolet, Inc.*, 192 A.2d 682, 687 (Pa. 1963); *see also* RESTATEMENT (SECOND) OF TORTS §496B (1965) ("A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."). An exculpatory contract contravenes public policy when it violates an obvious, "overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards." *Tayar*, 47 A.3d at 1199, *citing Williams,* 32 A.3d at 1200. An otherwise valid contract will not be voided in favor of a vague public policy goal; rather, this Court requires that to support such a heavy-handed result, the alleged public policy must be:

> ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. . . . [T]here must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy[.] . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Williams*, 32 A.3d at 1200 (citation omitted).

This Court has observed that pre-injury exculpatory clauses releasing a party from ordinary negligence generally are not against public policy, *see Tayar*, 47 A.3d at 1199-1200, *citing*, *e.g.*, *Chepkevich*; however, we have also held that pre-injury exculpatory releases immunizing parties from liability for their reckless or grossly negligent conduct firmly violate public policy — and are therefore not enforceable — because "such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct." *Id.* at 1203 (relating to reckless conduct); *Feleccia*, 215 A.3d at 20 (relating to gross negligence).

An exculpatory clause is similarly void as against public policy where it immunizes a party from the consequences of violating a statute or regulation intended to preserve health or safety. In *Boyd*, we determined the General Assembly's enactment of a statute requiring tenements to be equipped with fire escapes avoided an exculpatory provision in a residential lease that purported to relieve the landlord, who did not supply a fire escape, of liability for negligence when the building's residents were severely burned in a fire. *Boyd*, 94 A.2d 44. The Court stated,

> in such event public policy does not permit an individual to waive the protection which the statute is designed to afford him. . . . "Statutes grounded on public policy are those which forbid acts having a tendency to be injurious to the public good. . . . Where public policy requires the observance of a statute, it cannot be waived by an individual or denied effect by courts, since the integrity of the rule expressed by the Legislature is necessary for the common welfare." . . . "Where the legislature has, by definite and unequivocal language, determined the public policy of this Commonwealth with regard to a particular subject, that pronouncement cannot be set aside and rendered unenforceable by a contract between individuals."

*Id*. at 46, *quoting*, *respectively*, *In re McCurdy's Estate*, 154 A. 707, 709 (Pa. 1931) and *Bell v. McAnulty,* 37 A.2d 543, 544 (Pa. 1944); *see also Warren City Lines, Inc. v. United Refining Co.*, 287 A.2d 149, 151-52 (Pa. Super. 1971) (negligent violation of a regulation intended for the protection of the public renders an exculpatory clause invalid against public policy; contract could not, as a matter of law, relieve oil and gas company of liability for alleged negligent equipment maintenance performed in violation of State Fire Marshal's safety regulations).

In *Leidy*, the Superior Court, incorporating a survey of jurisdictions, further identified several categories of exculpatory contracts where releases of liability for negligent conduct violate public policy, including: "[i]n the employer-employee

relationship[;]" "**in situations where one party is charged with a duty of public service**," *e.g.,* public utilities, common carriers, hospitals, airports; in "agreements which attempt to exculpate one from liability for the violation of a statute or regulation designed to protect human life"; and in contracts involving "the limitation of consequential damages for injury to the person in the case of consumer goods[.]" *Leidy*, 381 A.2d at 167-68 (internal quotations and citations omitted); *see also Hinkal v. Pardoe*, 133 A.3d 738, 747-49 (Pa. Super. 2016) (Lazarus, J., dissenting) (emphasizing duty of public service, expressing the view that a gym membership contract involving personal training services implicated public health and safety concerns such that exculpatory release violated public policy); *State Farm Fire & Cas. Co. v. PECO*, 54 A.3d 921, 931-35 (Pa. Super. 2012) (Wecht, J., concurring and dissenting) (viewing public utility tariff's limitation of liability as an exculpatory clause that was void as against public policy where utility was "charged with a duty of public service").

The view that parties charged with a duty of public service cannot contractually exculpate themselves from liability for negligent conduct is consistent with both our precedent generally upholding releases of liability for the ordinary negligence of private parties, and the law across other jurisdictions recognizing a clear public policy violation where the party seeking exculpation is engaged in performing a service of significant importance or practical necessity to members of the public. *See* RESTATEMENT (SECOND) OF TORTS §496B cmt. g ("Where the defendant is a common carrier, an innkeeper, a public warehouseman, a public utility, or is otherwise charged with a duty of public service, and the agreement to assume the risk relates to the defendant's performance of any part of that duty, it is well settled that it will not be given effect. Having undertaken the duty to the

public, which includes the obligation of reasonable care, such defendants are not free to rid themselves of their public obligation by contract, or by any other agreement."); 17A C.J.S. Contracts §73 (1963) ("The rule invalidating contracts exempting from liability for negligence is frequently limited to the principle that parties cannot stipulate for protection against liability for negligence in the performance of a legal duty or a duty of public service, where a public interest is involved or a public duty owed, or, when the duty owed is a private one, where public interest requires the performance thereof."); 57A Am. Jur. 2d Negligence §56 ("No person can, by agreement, exempt himself or herself from liability for negligence in the performance of a duty imposed upon him or her by law, especially a duty imposed upon him or her for the benefit of the public."); 8 Williston on Contracts §19:31 (4th ed.) ("Generally, whenever there is a relationship involving a necessary public service, an agreement exempting the provider from its duties in that role is invalid.").

The parties agree the City has a duty, derived from common law, to repair and maintain its streets for their ordinary and necessary use by the public, and the City concedes it may be held liable for injuries caused by its negligent failure to do so. *See* City's Brief at 18. The common law cause of action for negligent breach of a municipality's non-delegable duty to repair dangerous street conditions is perhaps older than most of Philadelphia's streets themselves; recognized and enforced for over a century, the duty withstood the evolution of governmental immunity in Pennsylvania throughout the late-nineteenth and twentieth centuries, which otherwise shielded municipalities and their employees from tort liability in most circumstances as a rule with few exceptions. *See, e.g.*, *Drew v. Laber*, 383 A.2d 941, 943 (Pa. 1978) ("Under Pennsylvania law a municipality is required to construct and maintain its highways in such a manner as to

protect travelers from dangers which, by the exercise of normal foresight, careful construction and reasonable inspection, can be anticipated and avoided.") (internal quotation omitted); *Good v. Philadelphia*, 6 A.2d 101, 102 (Pa. 1939) ("[T]he liability of a municipality for injuries suffered as a result of defects in the highway arises only when it has notice, actual or constructive, of the existence of a dangerous condition."); *Lawrence v. City of Scranton*, 130 A. 428, 430 (Pa. 1925) ("The primary duty of keeping its streets in travelable condition is on the city. When public safety is concerned, this duty cannot be delegated to others.") (internal quotation and citation omitted); *Harvey v. City of Chester*, 61 A. 118, 118 (Pa. 1905) ("The primary duty of keeping its streets in travelable condition is on the city, and, while it may turn over their control to an independent contractor for specified purposes and limited time, it cannot by contract relieve itself indefinitely from its duty in that regard."); *see also Ayala v. Philadelphia Bd. of Pub. Educ.*, 305 A.2d 877, 879-81 (Pa. 1973) (describing evolution of common law governmental immunity doctrine).

In 1973, this Court categorically abolished the common law defense of governmental immunity to tort liability in *Ayala*, 305 A.2d at 878, and similarly abrogated the companion doctrine of sovereign immunity regarding claims against Commonwealth entities in *Mayle v. Pa. Dep't of Highways*, 388 A.2d 709, 720 (Pa. 1978). But, in response, the General Assembly enacted the Tort Claims Act, 42 Pa.C.S. §§8541-8564, and the Sovereign Immunity Act, 42 Pa.C.S. §§8521-8528, reinstating the general rule of governmental and sovereign immunity from tort liability with the force of legislation, and enumerating a limited number of exceptions where the protection was waived, including such an exception for certain known or reasonably knowable dangerous conditions of the streets. In its current form, the Tort Claims Act provides, in its first section, "Except as

otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S. §8541. The Act's second section, titled "Exceptions to governmental immunity," provides for nine enumerated exceptions to immunity, stating, in relevant part:

> **(a) Liability imposed.--**A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
>> (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
>>
>> (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.
>
> **(b) Acts which may impose liability.--**The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
>> *          *          *
>
>> (6) *Streets.--*
>>
>>> (i) A dangerous condition of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

*Id.* §8542. Where an exception to governmental immunity applies, the Act additionally provides a limitation on damages, *see id.* §8553(b) (damages "shall not exceed $500,000

in the aggregate"), and permission and parameters for the purchase and use of liability insurance policies by municipalities and their employees, *see id.* §8564.

We have interpreted the Tort Claims Act's immunity provision broadly as an "absolute" and "not waivable" shield to liability, which in turn necessitates the narrow construction of the enumerated, "exclusive" exceptions. *Gray*, 633 A.2d at 1093; *see Dorsey*, 96 A.3d at 341 ("[I]n interpreting the Tort Claims Act, exceptions to the absolute rule of immunity expressed in the statute 'must be narrowly interpreted given the expressed legislative intent to insulate political subdivisions from tort liability.'") (quoting *Mascaro v. Youth Study Ctr.*, 523 A.2d 1118, 1123 (Pa. 1987)). In ascertaining the Act's legality and legislative intent, we have repeatedly observed its provisions were based on the report and recommended text prepared by the General Assembly's Joint State Government Commission tasked with analyzing the benefits and costs of the sovereign immunity defense. *See* Sovereign Immunity, Pennsylvania General Assembly, Joint State Government Commission (May 1978), http://jsg.legis.state.pa.us/resources/documents/ftp/publications/1978-05-01%201978%20Sovereign%20Immunity.pdf (last visited June 21, 2021); *see Carroll*, 437 A.2d at 397 (quoting Sovereign Immunity); *Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1121, 1124, 1130 (Pa. 2014) (discussing Sovereign Immunity). The Commission's report makes clear the Act's provisions are intended to "assure[] that the Commonwealth will not be required to process and defend various litigation brought against it in areas where risk management is totally uncertain" and "prohibit the creation of any new causes of action and merely [ ] remove the bar from suit where the cause of action already exists in the enumerated areas." Sovereign Immunity at 10-11.

We have also considered the interplay between the Tort Claims Act and Sovereign Immunity Act with other laws.[10] In *Dorsey*, though mindful of the strictures of the Tort Claims Act's exclusive immunity exceptions, this Court determined that another statute, depending upon its particular construction and the timing of its enactment, might permissibly allow governmental liability for circumstances outside of Section 8542. *Dorsey*, 96 A.3d at 341-42 (holding the Tort Claims Act does not provide immunity for cause of action arising from breach of Section 3172 of the Probate, Estates and Fiduciaries Code, which confers liability upon the register of wills). And, in *Dep't of Envtl. Res. v. Auresto*, 511 A.2d 815 (Pa. 1986), a case relied upon by the City, the Court considered whether the Recreational Use of Land and Water Act, 68 P.S. §§477-1 - 477-8, which provides tort immunity for landowners who allow public use of their property free of charge, could protect the Commonwealth from liability notwithstanding the Sovereign Immunity Act's waiver of immunity for injuries caused by a dangerous condition on Commonwealth-owned real estate. Noting the Recreation Act was enacted prior to the Sovereign Immunity Act, at which time sovereign immunity was the blanket rule at common law, the *Auresto* Court reasoned the legislature would not have anticipated the possibility of Commonwealth liability; in addition, because the Sovereign Immunity Act

---

[10] Because of the similarities of their provisions, the Tort Claims Act and Sovereign Immunity Act are interpreted consistently. *Finn v. City of Philadelphia*, 664 A.2d 1342, 1344 (Pa. 1995) ("[T]his court has held that the two statutes dealing with governmental and sovereign immunities, *viz.*, the Political Subdivision Tort Claims Act and the Sovereign Immunity Act, are to be interpreted consistently, as they deal with indistinguishable subject matter."), *citing, inter alia, Kiley by Kiley v. City of Philadelphia*, 645 A.2d 184, 186 (Pa. 1994), *Snyder v. Harmon*, 562 A.2d 307, 312 n.7 (Pa. 1989); *see also McCalla v. Mura*, 649 A.2d 646, 648-49 (Pa. 1994) (analogizing the Court's interpretation of Sovereign Immunity Act Subsection 8522(b)(4), regarding waiver of immunity for Commonwealth real estate, highways and sidewalks, to interpret Tort Claims Act Subsection 8542(b)(6), regarding waiver of immunity for municipality-owned streets).

was intended to expose the Commonwealth to the same liability as a private citizen, and a private citizen would have a statutory immunity defense, the Court determined the Commonwealth also had the protection of the particular immunity defense. *Auresto*, 511 A.2d at 817.

In contrast to these decisions in *Dorsey* and *Auresto*, where this Court approved of particular liability and immunity provisions supplied by other statutes which fell outside the parameters of, but were read in *pari materia* with, the governmental immunity acts, we have refused to adjust those boundaries to accommodate a local government ordinance: in *Gray*, we invalidated a Philadelphia ordinance which waived immunity for the negligent acts of police, finding it authorized the imposition of damages in situations not within Section 8542 of the Tort Claims Act, and "[t]herefore, the ordinance permits what the Act expressly prohibits, and it is thus invalid." *Gray*, 633 A.2d at 1093; *see also Dorsey*, 96 A.3d at 340 ("[O]ur Court has recognized that the legislature is the exclusive body with authority to confer immunity upon political subdivisions."), *citing Gray*, 633 A.2d at 1093; *Carroll*, 437 A.2d at 396 ("[M]unicipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the [l]egislature and subject to change, repeal or total abolition at its will.") (citations and quotations omitted).

Furthermore, this Court has interpreted the Tort Claims Act Subsection 8542(b)(6) exception to immunity for dangerous conditions of municipally-owned streets consistently with Subsection 8522(b)(4) of the Sovereign Immunity Act (relating to waiver of immunity for Commonwealth real estate, highways and sidewalks), and held a municipality owes a

duty of care to those using its property "to make its highways reasonably safe for their intended purpose," "such as to require that the condition of the property is safe for the activities for which it is regularly used, intended to be used or reasonably foreseen to be used[.]" *McCalla v. Mura*, 649 A.2d 646, 649 (Pa. 1994), *citing Bendas v. White Deer*, 611 A.2d 1184, 1186 (Pa. 1992); *see also supra* n.9.

We further note that, with specific regard to the streets of Philadelphia, the City's Home Rule Charter provides, in relevant part:

> The Department of Streets shall have the power and its duty shall be to perform the following functions:
>
> (a) City Streets. It shall itself, or by contract, design construct, repair and maintain:
>
>> (1) City streets, which shall include highways, roads, streets, alleys, footways, bridges, tunnels, overpasses and underpasses, including approaches and viaducts, owned, controlled or operated by the City or designated in accordance with law as streets of the City[.]

Philadelphia Home Rule Charter §5-500(a)(1). A home rule charter, as defined by the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. §§2901-2984, is "[a] written document defining the powers, structures, privileges, rights and duties of the municipal government and limitations thereon." 53 Pa.C.S. §2902. This Court has recognized the Home Rule Charter "emanated from the relevant provision of the State Constitution . . . and was duly adopted (*i.e.*, enacted) by the affirmative vote of the electors of the City as the organic law of the corporate municipal body." *In re Addison*, 122 A.2d 272, 275-76 (Pa. 1956). "That the Charter constituted legislation no less than does a statute of the legislature to like end is too plain for even cavil. . . . Wherefore, upon its due adoption, Philadelphia's Home Rule Charter took on the force and status of a legislative enactment." *Id.* at 275-76.

### IV. Analysis

There is a well-defined public interest in the maintenance and safe repair of dangerous conditions existing on government-owned streets, and the municipal owners are thus charged with a duty of public service to perform such maintenance and repairs as a matter of necessity to members of the public. This dominant public policy is derived from over one hundred years of common law, is codified by statute within the Tort Claims Act, and is reflected by the organizational assignment of explicit duties within the Philadelphia Home Rule Charter.

While the clearly established policy of the Tort Claims Act is to provide an absolute rule of governmental immunity from negligence subject to its few, explicit exceptions without **creating** new causes of action, it is likewise the clear policy of the Act to **codify** and **define** the parameters of those excepted, permissible causes of action. Relevant here, the Tort Claims Act provides "[a] local agency **shall be liable for damages** on account of an injury to a person" where "damages would be recoverable under common law or a statute" if caused by a non-government entity, for "negligent acts of the local agency" consisting of "[a] dangerous condition of streets owned by the local agency" when the condition created a "reasonably foreseeable risk" of the kind of injury suffered, and when "the local agency had actual notice or could reasonably be charged with notice under the circumstances." 42 Pa.C.S. §8542(a), (b)(6) (emphasis added). Similarly, though whether the Philadelphia Home Rule Charter **creates** a duty giving rise to a cause of action, or expresses a dominant public policy, is not squarely before us, what it certainly does do is "define" — with the same legal force as a statute, *see In re Addison*, 122 A.2d at 275-76 — the City's mandatory and exclusive responsibility, through its Department of Streets, to "design construct, repair and maintain [ c]ity streets[.]" 53 Pa.C.S. §2902

(definition of "home rule charter"); Philadelphia Home Rule Charter §5-500(a)(1). In furtherance of the Tort Claims Act's expression of policy to protect the public fisc by limiting municipalities' exposure to liability, for instances where immunity is waived, the General Assembly provided a statutory cap on the amount of damages recoverable, defined the circumstances under which damages shall be recoverable, authorized local agencies to purchase or administer liability insurance, and prescribed permissible payment planning for judgments not fully indemnified by insurance. 42 Pa.C.S. §§8553, 8559, 8564.[11] What the General Assembly did not provide, however, is a mechanism for a municipality to immunize itself, through exculpatory contracts or any other means.

The City is a municipality, an agent of the state, "invested with certain subordinate governmental functions for reasons of convenience and public policy[,] . . .and the extent of [its] powers [is] determined by the [l]egislature[.]" *Carroll*, 437 A.2d at 396 (citations and quotations omitted). "[T]he legislature is the exclusive body with authority to confer immunity upon political subdivisions" for claims arising out of exceptions to the Tort

---

[11] Though the dissent suggests we have not identified statutory language expressing an "intent to prevent the City from limiting its liability by contractual release[,]" Dissenting Opinion at 2, we conclude these provisions of the Act prescribing both the terms of payment plans and limitations on liability via a damages cap and indemnity agreements, in conjunction with the Act's pronouncement a municipality "shall be liable for damages" resulting from certain known conditions of the roads, indicate the General Assembly has considered the parameters for limiting municipal liability "in areas where risk management is totally uncertain[,]" and applied them; the provisions thus do express an intent to prevent a municipality from complete exculpation of liability by release. 42 Pa.C.S. §8542; *see id.* §§8553, 8559, 8564; Sovereign Immunity at 10. Furthermore, in holding the fully exculpatory release in this case is invalid, we do not foreclose the possibility the City may devise some other valid limitation on liability, the contours of which are not implicated here. *See, e.g.*, *State Farm*, 54 A.3d at 933, 939-40 (Wecht, J., concurring and dissenting) (in accordance with RESTATEMENT (SECOND) OF CONTRACTS §195, party charged with duty of public service may not be **exempted** from tort liability; however a **limitation on liability** may be valid, but must be reasonable "'and not so drastic as to remove the incentive to perform with due care'"), *quoting Valhal Corp.*, 44 F.3d at 204 (emphasis added).

Claims Act. *Dorsey*, 96 A.3d at 340 (citation omitted). Because the Release would allow the City to confer immunity upon itself for such claims, the Release prohibits what the Act expressly allows, and would achieve for the City what our jurisprudence plainly prohibits. *Id.*; *cf. Gray*, 633 A.2d at 1093-94. "Where the legislature has, by definite and unequivocal language, determined the public policy of this Commonwealth with regard to a particular subject," — here, the definitive policy to remove the shield of immunity for a municipality's negligence in the maintenance or repair of dangerous street conditions for which they have proper notice — "that pronouncement cannot be set aside and rendered unenforceable by a contract between individuals." *Boyd*, 94 A.2d at 46 (internal quotations omitted). Thus, the Release is invalid because it contravenes public policy.[12]

We disagree with the City's position its role is identical to any private host of a recreational or non-essential event that may immunize itself from liability for breach of its duty to maintain safe premises. Though we recognize a plaintiff's ordinary negligence claims may generally be barred where he voluntarily executes an exculpatory contract in

---

[12] The dissent observes, consistent with our decision in *Williams*, it is the General Assembly's role "to determine what policy aims are important enough to justify overturning a private contract." Dissenting Opinion at 2, *citing Williams*, 32 A.3d at 1200. We agree, and acknowledge the aims of the Tort Claims Act are not the same as a mandatory health and safety statute the violation of which constitutes negligence *per se*. *See id.* at 4-5. However, contrary to the dissent and as explained in greater detail throughout this analysis, the General Assembly has conferred limited powers to municipalities, and prescribed limitations on both municipal liability and municipal immunity. Thus, rather than "conflat[ing] statutory governmental immunity with a private contractual release of liability" as the dissent describes, *id.* at 3, we conversely view the immunity afforded by the exculpatory release in this case as impermissibly conflating a private contract with the status of those statutory provisions defining the parameters of governmental immunity. *See supra* n.11; *see also Valhal Corp.*, 44 F.3d at 206-07 (under Pennsylvania law, party's charge with duty to the public would "elevate its private contracts to matters of public concern" and therefore violate public policy).

order to participate in such activities, the recreational, non-essential nature of the event is not dispositive in this instance. A private host is not assigned the same mandatory duty of public service as is the City, to maintain its public streets in a condition that is "reasonably safe for their intended purpose," that is, "safe for the activities for which [they are] regularly used, intended to be used or reasonably foreseen to be used" by the travelling public under the conditions specified by the Tort Claims Act. *McCalla*, 649 A.2d at 648-49.[13] Though the event's use of the City's streets may have been time-limited and non-essential, the City's duty to exercise reasonable care in discharging its independently-derived and essential function of street repair arose long before the Bike Ride. The City's duty materialized when the City had actual notice or could reasonably be charged with notice of the existence of the sinkhole. Under these circumstances — where the City was charged with an essential public-service duty, and the fact-finder determined the requisite elements of the statutory exception to immunity (including proper notice of a dangerous condition and a reasonably foreseeable risk of injury) had been established — enforcing the Release to immunize the City would jeopardize health, safety, and

---

[13] To the extent the City argues its duty related to the Bike Ride is not in the same category as entities found to be charged with a duty of public service, *see* City's Brief at 15, it draws our attention to RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY §2 comment e (2000), presumably to indicate the category is limited to the entities expressly listed therein. More completely, comment e states, "An agreement purporting to exculpate a person charged with the public duty to perform a service — **such as** a common carrier, an innkeeper, a public warehouse, or a public utility — is normally not effective unless the terms of the agreement have been approved by a public regulatory body." *Id.* (emphasis added). The Reporter's Note to comment e further provides, "In some situations, exculpatory contracts are against public policy and are unenforceable. The most common situation is when the defendant is performing a public-service duty." *Id.* We do not view these examples as providing a complete list of types of entities charged with public duty. Nor do we herein adopt this restatement of the law, but note it supports the proposition that an entity performing a duty of public service cannot exculpate itself by contract.

welfare of the people by removing any incentive for parties to exercise minimal standards of care due to maintain public streets in reasonably safe condition for their reasonably foreseeable uses, such as a planned charity bike ride, where known or knowable dangerous conditions pose great and reasonably preventable risks.[14] *See Tayar*, 47 A.3d at 1203; *Feleccia*, 215 A.3d at 21; *McCalla*, 649 A.2d at 648-49; 42 Pa.C.S. §8542(b)(6).

## V. Conclusion

Accordingly, we hold it is contrary to public policy to enforce an exculpatory contract immunizing the City from its essential duty of public service, which exists notwithstanding the context of a recreational event. Any other application of the Release would elevate the City's private exculpatory contract over the public duties assigned to it and the authority afforded to it by the General Assembly. Under these discrete circumstances, enforcement of the Release would jeopardize the health, safety and welfare of the public at large, and the Release is thus rendered invalid as it violates public policy principles. We therefore reverse the decision of the Commonwealth Court.

Order reversed. Jurisdiction relinquished.

Justices Donohue, Wecht and Mundy join the opinion.

Chief Justice Baer files a dissenting opinion in which Justices Saylor and Todd join.

---

[14] We do not herein address injuries related to risks associated with the event itself, but only those related to the particular conditions of the streets for which the City "had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition." 42 Pa.C.S. §8542(b)(6)(i).